No. 26-12027

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

◆

**JEFFERY LEE, Plaintiff-Appellee,**

**v.**

**GREG LOVELACE, Commissioner, Alabama Department of Corrections, et al., Defendants-Appellants.**

◆

*On Appeal from the United States District Court for the Middle District of Alabama (Case No. 2:25-cv-00680-ECM)*

## APPELLANTS' BRIEF AND MOTION TO STAY JUDGMENT OF DISTRICT COURT PENDING APPEAL

Steve Marshall
*Alabama Attorney General*

A. Barrett Bowdre
*Solicitor General*

Robert M. Overing
*Principal Deputy Solicitor General*

Lauren A. Simpson
*Deputy Attorney General*

Polly S. Kenny
Brenton L. Thompson
Talmadge Butts
*Assistant Attorneys General*

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
June 10, 2026
Lauren.Simpson@AlabamaAG.gov

**CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1. Alabama Department of Corrections

2. Antognini, Dr. Joseph F. (Defendants' expert)

3. Arnold & Porter Kaye Scholer LLP (counsel for Appellee)

4. Bastarache, Dr. Julie A. (Plaintiff's expert)

5. Bickler, Dr. Philip E. (Plaintiff's expert)

6. Bowdre, A. Barrett (counsel for Appellants)

7. Butts, Talmadge (counsel for Appellants)

8. Ciliberti, Angelique (counsel for Appellee)

9. Cline, Kevin A. (counsel for Appellee)

10. Hamm, John Q. (Former commissioner of the Alabama Department of Corrections, former defendant)

11. Heath, Dr. Mark J. (Plaintiff's expert)

12. Huynh, Tommy (counsel for Appellee)

13. Kenny, Polly S. (counsel for Appellants)

14. Lee, Jeffery (Plaintiff-Appellee)

15. Lovelace, Greg (Commissioner of the Alabama Department of Corrections, Defendant-Appellant)

16. Marks, Hon. Emily C. (district judge)

17. Marshall, Steve (Alabama Attorney General)

18. Overing, Robert M. (counsel for Appellants)

19. Raybon, Terry (Warden, Holman Correctional Facility, Defendant-Appellant)

20. Schwartzstein, Dr. Richard M. (Plaintiff's expert)

21.   Sharpe, Paige H. (counsel for Appellee)

22.   Simpson, Lauren A. (counsel for Appellants)

23.   Thompson, Anna Ku (counsel for Appellee)

24.   Thompson, Brenton L. (counsel for Appellants)

25.   Thompson, Caleb (counsel for Appellee)

26.   Uria, Alejandra C. (counsel for Appellee)

27.   Wiesner, Jocelyn A. (counsel for Appellee)

28.   Williams, Dr. James S. (Plaintiff's expert)

Undersigned also certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

/s/ **Lauren A. Simpson**
Lauren A. Simpson
*Deputy Attorney General*

**STATEMENT REGARDING ORAL ARGUMENT**

Jeffery Lee is scheduled to be executed on June 11. Because of the expedited nature of this appeal, and as this Court heard oral argument in Lee's appeal on June 5, Appellants do not request oral argument.

Certificate of Interested Persons ...................................................................1

Statement Regarding Oral Argument ......................................................... i

Table of Authorities .................................................................................. iv

Introduction ...............................................................................................1

Statement of the Issues...............................................................................7

Statement of the Case.................................................................................8

    A.    Lee's crime, conviction, and conventional appeals .............................8

    B.    Lee's additional state litigation and first method-of-execution challenge....................................................................................10

    C.    Nitrogen hypoxia executions.............................................................10

    D.    The present lawsuit...........................................................................12

    E.    Lee's appeal......................................................................................15

    F.    The remand.......................................................................................16

Summary of the Argument........................................................................18

Standard of Review: Appeal from Bench Trial .......................................18

Argument...................................................................................................19

    I.    The district court's factual findings as to Dr. Williams's opinions are clearly erroneous. ........................................................19

        A.    Dr. Williams's relationship with the Mahdi family..................19

        B.    Dr. Williams's feasibility opinions...........................................21

    II.    The district court's factual findings as to ADOC's penological reasons not to adopt firing squad are clearly erroneous......................31

A. Personnel concerns.................................................................31

B. Facility concerns .................................................................35

Standard of Review: Stay of Lower Court's Judgment Pending Appeal ................40

Argument...........................................................................................40

I. Appellants are likely to succeed on the merits...................................40

II. The balance of the equities demands a stay. ......................................41

Conclusion .......................................................................................45

Certificate of Compliance ...................................................................46

Certificate of Service .........................................................................47

**Cases**

*Arthur v. Dunn*, 137 S. Ct. 725 (2017) ....................................................................2

*Baze v. Rees*, 553 U.S. 35 (2008)...........................................................................1

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227 (11th Cir. 2009) ....................................................................................27

*Boyd v. Comm'r, Ala. Dep't of Corr.*, 25-13545, 2025 WL 2970017 (11th Cir. Oct. 20, 2025) ............................................................................ 11, 32

*Boyd v. Hamm*, 2:25-cv-00529, 2025 WL 2884410 (M.D. Ala. Oct. 9, 2025).......11

*Bucklew v. Precythe*, 587 U.S. 119 (2019) ....................................................... passim

*Calderon v. Thompson*, 523 U.S. 538 (1998) .......................................................42

*Campbell v. Wood*, 114 S. Ct. 2125 (1994) ...........................................................1

*CompuLife Software v. Newman*, 959 F.3d 1288 (11th Cir. 2020) ........................18

*Fierro v. Gomez*, 77 F.3d 301 (9th Cir. 1996)........................................................2

*Frazier v. Hamm*, 2:24-cv-00732, 2025 WL 361172 (M.D. Ala. Jan. 31, 2025) ..................................................................................................11

*Glass v. Louisiana*, 471 U.S. 1080 (1985)................................................................2

*Glossip v. Gross*, 576 U.S. 863 (2015) ............................................................ passim

*Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894 (11th Cir. 2024).............11

*Grayson v. Hamm*, 2:24-cv-00376, 2024 WL 4701875 (M.D. Ala. Nov. 6, 2024) .............................................................................................11

*Hoffman v. Westcott*, 3:25-cv-00169, 2025 WL 763945 (M.D. La. Mar. 11, 2025) .............................................................................................11

*Hunt v. Alabama*, 145 S. Ct. 2790 (2025)............................................................11

*Hurst v. Florida*, 577 U.S. 92 (2016)........................................................................10

*Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137 (1999).......................................27

*Lee v. Comm'r, Ala. Dep't of Corr.*, 26-11864, 2026 WL 1651147 (11th Cir. June 8, 2026)........................................................... 3, 15, 16

*Lee v. Dunn*, 1:16-cv-00473 (S.D. Ala. July 20, 2018) ................................. 10, 43

*Lee v. State*, 244 So. 3d 998 (Ala. Crim. App. 2017) ................................................10

*Lee v. State*, 898 So. 2d 790 (Ala. Crim. App. 2001) ................................................10

*Lee v. Thomas*, 1:10-cv-00587, 2012 WL 1965608 (S.D. Ala. May 30, 2012) ........9

*Lee v. Thomas*, 572 U.S. 1015 (2014) .......................................................................10

*Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947).............................2, 15

*McGehee v. Hutchinson*, 854 F.3d 488 (3d Cir. 2017)...................................... 33, 38

*Middlebrooks v. Parker*, 22 F.4th 621, 628 (6th Cir. 2022) .....................................43

*Mills v. Hamm*, 102 F.4th 1245 (11th Cir. 2024) .......................................................5

*Mitchell v. Ford Motor Co.*, 318 F. App'x 821 (11th Cir. 2009) .............................24

*Nance v. Comm'r, Ga. Dep't of Corr.*, 59 F.4th 1149 (11th Cir. 2023)...................29

*Nance v. Ward*, 597 U.S. 159 (2022)..........................................................................3

*Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317 (11th Cir. 2019) ..........................33

*Smith v. Hamm*, 144 S. Ct. 414 (2024) .....................................................................11

*Smith v. Hamm*, 2:23-cv-00656, 2024 WL 116303 (M.D. Ala. Jan. 10, 2024).......11

*Stewart v. LaGrand*, 526 U.S. 115 (1999) ..................................................................2

*Walls v. Sec'y, Dep't of Corr.*, 161 F.4th 1281 (11th Cir. 2025) ..............................5

*Wilkerson v. Utah*, 99 U.S. 130 (1879)...................................................................2, 4

## Rules

FED. R. CIV. P. 26 ...............................................................................................24

FED. R. CIV. P. 37 ...............................................................................................24

FED. R. CIV. P. 52 ...............................................................................................18

This is an appeal of a final order in a 42 U.S.C. §1983 lawsuit challenging the constitutionality of Alabama's nitrogen hypoxia execution protocol. The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1343(a), 2201(a), and 2202.

**INTRODUCTION**

"Because it is settled that capital punishment is constitutional," the Supreme Court wrote in *Glossip v. Gross*, "'[i]t necessarily follows that there must be a [constitutional] means of carrying it out.'" 576 U.S. 863, 869 (2015) (quoting *Baze v. Rees*, 553 U.S. 35, 47 (2008)). What the district court and this Court have done over the last forty-eight hours flies in the face of this principle.

"While methods of execution have changed over the years, '[t]his Court has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment.'" *Id.* (quoting *Baze*, 553 U.S. at 48). Challenged methods of execution include hanging, firing squad, lethal gas, electrocution, and lethal injection. The *Glossip* Court traced these methods from hanging to lethal injection, at the time the newest method, explaining that each change was made with the belief that the new method was more humane than its predecessors. *Id.* at 867-69.

But "the Constitution does not require the avoidance of all risk of pain" in execution, *id.* at 869, and no method of execution is guaranteed to be perfectly painless. For example, an inmate being hanged might not have his neck broken, leaving him to slowly strangle to death (or at the other extreme, he might be decapitated by the force of the drop). *Bucklew v. Precythe*, 587 U.S. 119, 132-33 (2019); *Campbell v. Wood*, 114 S. Ct. 2125, 2127 (1994) (Blackmun, J., dissenting). Hanging has never been deemed unconstitutional. An inmate facing the firing squad might be quickly dispatched or, like Mikal Mahdi in South Carolina last year, he might suffer the pain of being shot multiple times in the chest due to poor aim.[1] The Supreme Court has still upheld the constitutionality of the method. *Wilkerson v. Utah*, 99 U.S. 130 (1879). An inmate being electrocuted could burn while he dies, as in the execution of John Louis Evans. *Glass v. Louisiana*, 471 U.S. 1080, 1091-92 (1985) (Brennan, J., dissenting from denial of certiorari). The Supreme Court still found this method to be constitutional and "did not retreat from that holding even when presented with a case in which a State's initial attempt to execute a prisoner by electrocution was unsuccessful." *Glossip*, 576 U.S. at 869 (citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947)). Cyanide gas executions allegedly

---

1. *E.g.*, Chiara Eisner, *A Firing Squad Tried to Shoot a Prisoner in the Heart. They Missed, Autopsy Indicates*, NPR (May 8, 2025, 2:41 PM), www.npr.org/2025/05/08/nx-s1-5389846/firing-squad-south-carolina-death-penalty-execution.

"exacted 'exquisitely painful' sensations of 'anxiety, panic, [and] terror.'" *Arthur v. Dunn*, 137 S. Ct. 725, 732 (2017) (mem.) (Sotomayor, J., dissenting from denial of certiorari) (quoting *Fierro v. Gomez*, 77 F.3d 301, 308 (9th Cir. 1996)). Still, the Supreme Court permitted their use as recently as 1999. *See, e.g.*, *Stewart v. LaGrand*, 526 U.S. 115 (1999) (vacating Ninth Circuit injunction prohibiting gas chamber execution).[2] As for lethal injection, if the drugs are not administered properly, as in the case of Clayton Lockett, the inmate can suffer, *see Glossip*, 576 U.S. at 872, but the Supreme Court has not invalidated this method of execution.

Now before this Court for the fifth time is Alabama's nitrogen hypoxia protocol, which has to date successfully been used to execute seven inmates. The district court did not find that the protocol causes true pain but rather one to three minutes of dyspnea, which can bring with it "emotional distress, anxiety, physiological stress, and physical discomfort." DE176:56. This Court, however, found that this risk of brief distress "'presents a "substantial risk of serious harm"— severe pain over and above death itself.'" *Lee v. Comm'r, Ala. Dep't of Corr.*, 26-

---

2. Walter LaGrand, an Arizona inmate, filed a habeas petition challenging lethal gas as unconstitutional. A Ninth Circuit panel enjoined the state from using that method, but the Supreme Court summarily reversed and vacated the injunction. In part, the Court held that LaGrand, "by his actions, has waived his claim that execution by lethal gas is unconstitutional," as he specifically elected it over lethal injection. *Id.* at 119. While the legal landscape has shifted since 1999, the State cannot help but note that Lee did the same thing: he elected nitrogen hypoxia over lethal injection in 2018, and now claims it is unconstitutional.

11864, 2026 WL 1651147, at *8 (11th Cir. June 8, 2026) (quoting *Nance v. Ward*, 597 U.S. 159, 164 (2022) (quoting *Glossip*, 576 U.S. at 877)). If nitrogen hypoxia violates the Eighth Amendment because of a risk of anxiety and emotional discomfort, then so too must every other method of execution, many of which carry inherent risks of real ***physical pain***—manual strangulation, bullets ripping through flesh and bone but not killing, the "agonizing choking and gagging" of death by cyanide,[3] burning alive, and drugs delivered in insufficient doses.

This cannot be right. If these methods of execution are constitutional, then so is nitrogen hypoxia, which at most can cause shortness of breath and a fear of death—the latter of which is unavoidable under the circumstances. Adding firing squad as a comparator does not render nitrogen hypoxia unconstitutional any more than it does any other traditionally accepted method.

Appellants do not contend (and did not need to prove) that firing squad is constitutionally suspect. *Contra* DE187:19. Indeed, the Supreme Court has deemed it constitutional since the nineteenth century. *Wilkerson*, 99 U.S. 130. But it's

---

3. Patty Machelor, *LaGrand: 18 Minutes to Die*, Tucson Citizen (Mar. 4, 1999). The account of LaGrand's execution stated, "Moments later, the execution proceeded as cyanide pellets were dropped into the acid below the chair. The witness room fell silent as a mist of gas rose, much like steam in a shower, and Walter LaGrand became enveloped in a cloud of cyanide vapor. He began coughing violently—three or four loud hacks—and then, in what appeared to be his last moments of consciousness, he made a gagging sound before falling forward at about 9:15 p.m."

probably not completely "painless." And like any method, it carries risks—risks that the district court should not have ignored. Appellants vehemently dispute the conclusion that nitrogen hypoxia is unconstitutionally painful in comparison, that firing squad is a feasible, readily available, and significantly safer method, and that ADOC lacks valid penological reasons not to adopt it. Here, Appellants dispute the district court's findings of fact in its June 8 memorandum opinion (DE187), particularly as to the unsupported or contradictory opinions of Dr. James Williams. Appellants further dispute the court's findings as to ADOC's valid penological reasons not to pursue a fourth method of execution.

Finally, Appellants ask this Court to stay the district court's judgment. Appellants have a substantial likelihood of success on the merits, and they—and the State of Alabama more broadly—will be harmed if the State is not permitted to carry out Jeffery Lee's overdue death sentence on June 11. Despite having chosen nitrogen hypoxia as his method of execution nearly eight years ago, Lee ran out the limitations period and failed to request interim relief until just last week. *See Walls v. Sec'y, Dep't of Corr.*, 161 F.4th 1281, 1285 (11th Cir. 2025); *Mills v. Hamm*, 102 F.4th 1245, 1251 (11th Cir. 2024). His tardiness forced the district court and this Court into an emergency posture, and his gambit succeeded.

Lee filed a civil action against lethal injection in 2016, elected nitrogen hypoxia to avoid that method in 2018, DE173-203:23, and now, years later, claims

that the method *he chose* is unconstitutional and that he would prefer to be shot in the chest. Appellants have no doubt that should ADOC adopt the firing squad protocol Lee allegedly desires, he would find fault with it. Indeed, Lee admitted during his deposition that when he saw people get shot, they reacted "[l]ike it hurt," they "scream[ed] and moan[ed]," and that their recovery was "[p]retty painful." *Id.* at 31. This lawsuit, like his 2016 lethal injection challenge, is merely Lee's attempt to once more avoid his death sentence from 2000. After more than a quarter-century, the equities favor allowing the State to carry out Lee's long-delayed sentence.

As the merits and the balance of the equities favor Appellants, the Court should reverse the district court or, in the alternative, stay the lower court's judgment pending appeal.

## STATEMENT OF THE ISSUES

1. Whether the district court's findings of fact were clearly erroneous.

2. Whether the district court erred when it excluded the risks of firing squad on the ground that they do "not render the firing squad constitutionally suspect."

3. Whether the State has legitimate penological reason to reject firing squad as a fourth method of execution, namely that unlike any other method, it requires five willing and able executioners.

4. Whether the district court erred when determining that the nitrogen-hypoxia protocol violates the Eighth Amendment on the "assum[ption]…that the level of air hunger is the same throughout."

5. Whether Appellants are entitled to a stay of judgment pending appeal where they have a substantial likelihood of success on the merits and the equities favor timely execution.

## A.  Lee's crime, conviction, and conventional appeals

Jeffery Lee is scheduled to be executed on June 11 for the robbery-murder of Jimmy Ellis and Elaine Thompson.

In December 1998, Lee, his brother, and their cousin decided to rob Jimmy's Pawn Shop in Orrville, Alabama, a small town about fifteen miles from Selma. Lee went in and pretended he was looking for wedding rings for his girlfriend, and an employee, Helen King, assisted him. He told her he would return with money from his grandmother, bought a pint of liquor, and left. The conspirators parked up the street, and Lee drank the liquor and smoked a marijuana cigarette laced with cocaine. He returned to the store a few minutes later, armed with a sawed-off shotgun, announced, "What's up, motherfucker?" and began firing. He fatally shot the owner, Jimmy Ellis, in the chest, and one of the employees, Elaine Thompson, in the face.[4] King, who was also shot, survived by playing dead.

---

4. The habeas record, which is not in PACER, contains additional details. Thompson was shot at close range, and the pellets shattered her facial bones and macerated her frontal lobe. Vol.1, C.148; Vol.3, R.241. She was dead by the time law enforcement arrived, but the medical examiner testified that she could have lived, and suffered, for several minutes after Lee shot her. Vol.3, R.228, 242. Ellis endured damage to his ribcage, diaphragm, heart, stomach, small intestine, and liver. Vol.1, C.159. He suffered for several minutes, dying only after paramedics made it to the scene. Vol.3, R.228. King was hit in the fingers and arm, and one of her fingers had to be sewn back together. *Id.* at R.219. She was left traumatized by the crime and had to move away, testifying, "I don't feel safe anymore." Vol.4, R.469.

When Lee found himself unable to steal the bolted-down cash register, he stepped out of the store for a moment, leaving the shotgun on the counter. King seized her chance, called 911, and secured the doors before Lee returned and found himself locked out. He fled to Georgia, where he was apprehended the next morning. Lee signed a written confession, the surveillance footage from the store was shown to the jury, and King testified. "Multiple Alabama courts, including the trial judge and the Alabama Court of Criminal Appeals, characterized the evidence against Lee in the guilt phase of the trial to be 'overwhelming.'" *Lee v. Thomas*, 1:10-cv-00587, 2012 WL 1965608, at *1-2 & n.2 (S.D. Ala. May 30, 2012).

In April 2000, the jury found Lee guilty of three counts of capital murder and the attempted murder of King. The jury rendered an advisory penalty-phase verdict of life without parole by a 7-5 vote, but the trial court overrode, concluding that the aggravating circumstances outweighed the mitigating. *Id.* at *2. The court explained:

> The Defendant, with cold precision and premeditation, using a weapon designed for the sole purpose of extinguishing human life, mercilessly gunned down 3 people who were doing nothing more than trying to earn a living. As vividly shown by the surveillance video, he opened fire upon entering the door. He emptied his weapon, firing as quickly as he could, shot after shot. Miraculously, Helen King was spared and he only snuffed out the lives of two yet, in those few seconds of mayhem, he destroyed the lives of many. He planned his crime. He went to the store earlier in the day and pretended to shop for a ring. Instead, he was looking it over with an eye to return to commit his crime. When he returned, he fired immediately upon entering, with no warning and no questions asked. His intent was obvious; to take out the victims and steal what he could.

*Lee v. State*, 898 So. 2d 790, 856 (Ala. Crim. App. 2001) (on return to remand).

The state and federal courts (including this Court) denied Lee's claims of error at every stage. Lee's conventional appeals concluded in 2014 when the Supreme Court denied certiorari in habeas. *Lee v. Thomas*, 572 U.S. 1015 (2014) (mem.).

**B.      Lee's additional state litigation and first method-of-execution challenge**

Lee pursued two more actions prior to the one before the Court. In April 2016, he filed a successive state postconviction petition, arguing that Alabama's capital sentencing scheme was unconstitutional after *Hurst v. Florida*, 577 U.S. 92 (2016). The state courts denied relief, and the Supreme Court denied certiorari. *Lee v. State*, 244 So. 3d 998, 1004 (Ala. Crim. App. 2017); *cert. denied*, No. 1160675 (Ala. Aug. 25, 2017); *cert. denied*, 584 U.S. 915 (2018) (mem.).

Five months after initiating that action, Lee filed a 42 U.S.C. §1983 complaint in the Southern District of Alabama, arguing that ADOC's three-drug lethal injection cocktail with midazolam was unconstitutional. The complaint was dismissed on the parties' motion after Lee elected nitrogen hypoxia. *Lee v. Dunn*, 1:16-cv-00473 (S.D. Ala. July 20, 2018).

**C.      Nitrogen hypoxia executions**

On August 25, 2023, ADOC adopted a protocol for carrying out judicial executions by nitrogen hypoxia. The crux of the protocol is that it administers "pure nitrogen gas…through an industrial-use respirator mask" until the inmate dies.

*Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894, 896 (11th Cir. 2024). EKG machines and pulse oximeters are used to monitor that nitrogen is flowing to the inmate. *Id.*

Alabama used nitrogen hypoxia to carry out the sentences of Kenneth Smith (Supreme Court denied stay),[5] Alan Miller (settled),[6] Carey Grayson (Supreme Court denied stay),[7] Demetrius Frazier (did not appeal denial of injunctive relief),[8] Gregory Hunt (did not challenge method; Supreme Court denied stay),[9] Geoffrey West (did not challenge method), and Anthony Boyd (Supreme Court denied stay).[10] Louisiana employed a similar protocol to execute Jessie Hoffman (Supreme Court denied stay after Fifth Circuit vacated preliminary injunction).[11]

---

5. *Smith v. Hamm*, 2:23-cv-00656, 2024 WL 116303 (M.D. Ala. Jan. 10, 2024); *aff'd*, 24-10095, 24-10095, 2024 WL 266027 (11th Cir. Jan. 24, 2024); *cert. denied*, 144 S. Ct. 414 (2024) (mem.).
6. Joint Stipulation of Dismissal, *Miller v. Marshall*, 2:24-cv-00197 (M.D. Ala. Aug. 5, 2024), ECF79.
7. *Grayson v. Hamm*, 2:24-cv-00376, 2024 WL 4701875 (M.D. Ala. Nov. 6, 2024); *aff'd*, 121 F.4th 894 (11th Cir. 2024); *cert. denied*, 145 S. Ct. 586 (2024) (mem.).
8. *Frazier v. Hamm*, 2:24-cv-00732, 2025 WL 361172 (M.D. Ala. Jan. 31, 2025).
9. *Hunt v. Alabama*, 145 S. Ct. 2790 (2025) (mem.).
10. *Boyd v. Hamm*, 2:25-cv-00529, 2025 WL 2884410 (M.D. Ala. Oct. 9, 2025); *aff'd*, 25-13545, 2025 WL 2970017 (11th Cir. Oct. 20, 2025); *cert. denied*, 146 S. Ct. 40 (2025) (mem.).
11. *Hoffman v. Westcott*, 3:25-cv-00169, 2025 WL 763945 (M.D. La. Mar. 11, 2025); *vacated*, 131 F.4th 332 (5th Cir. 2025); *cert. denied*, 145 S. Ct. 797 (2025) (mem.).

**D. The present lawsuit**

Lee initiated this lawsuit on August 22, 2025, three days before the statute of limitations as to his challenge to ADOC's nitrogen hypoxia protocol ran. He named as defendants the ADOC commissioner (then John Hamm), the warden of Holman Correctional Facility (Terry Raybon), and one hundred John Does "employed by, or contracted with, ADOC" for execution matters. DE1:3-5. He raised four claims: (1) a facial challenge to the hypoxia protocol under the Eighth Amendment, naming MAID as his alternative, (2) a state constitutional challenge to the protocol, (3) a state constitutional challenge under the non-delegation doctrine, and (4) a claim of statutory vagueness in violation of the federal and state constitutions. *Id.* at 18-27. After a hearing on January 14, 2026, the district court consolidated Lee's case with seven similar cases, dismissed the Doe defendants, and dismissed all claims in Lee's complaint but the Eighth Amendment claim. DE33.

As noted above, Lee's conventional appeals concluded in 2014. Due to various factors, including Lee's election of nitrogen hypoxia in 2018, the State did not move for his execution until February 9, 2026. The State first gave notice to the district court (and Lee) in January 2026 that an execution motion would be forthcoming. *E.g.*, DE176:8. The district court promptly deconsolidated Lee's case and put it on an expedited schedule. *Id.* Lee amended his complaint on February 2, naming as his alternatives MAID and firing squad. DE40:20-22.

The parties engaged in expedited discovery, including depositions. The State provided an expert report from Dr. Joseph Antognini, while Lee provided expert reports from Dr. Philip Bickler, Dr. James Williams, Dr. Julie Bastarache, and Dr. Richard Schwartzstein. The parties stipulated to the prior testimony of Dr. Brian McAlary and Dr. Shante Hill. DE176:10 n.13, 33 n.29.

The matter went to trial on April 27-30. Not until cross-examination did Defendants learn that Dr. Williams had been formally retained by the attorney for and family of Mikal Mahdi, a South Carolina inmate executed by firing squad in 2025. Defendants moved to strike Dr. Williams's testimony, arguing that his undisclosed bias compromised his methodology and the reliability of his expert opinion—perhaps explaining why he failed to mention South Carolina's recent and controversial firing squad executions. The court denied that motion. DE149:128.

The district court resolved the factual and legal disputes as follows:

*Air hunger (dyspnea)*

- While 6.2% oxygen is "just sufficient to maintain consciousness," the oxygen concentration in the mask is below 6% about twenty-five seconds after the nitrogen is turned on, below 3% by thirty-three seconds, and below 2% by forty seconds. "An oxygen concentration of 2.1% would rapidly cause death." DE176:53-54.

- Dyspnea is not physical pain, but a "more holistic discomfort sensation." Severe dyspnea is also known as "air hunger," which can cause "extreme emotional distress, panic, anxiety, and fear because breathing is essential to human life." "Many people find air hunger 'worse than pain' because it is associated with the fear of dying." Dyspnea begins when atmospheric oxygen reaches below 15%. *Id.* at 54, 56.

- Once an individual's blood oxygen saturation is less than 90%, he will experience a strong drive to breathe to rectify the situation. *Id.* at 55-56.

- Hypercapnia (a buildup of carbon dioxide) can exacerbate dyspnea, but so can hypoxia alone, as well as physical restrictions on breathing. The chest restraints ADOC uses are not an impediment to breathing. *Id.* at 55.

- Dyspnea can be alleviated in the clinical setting by reducing anxiety and having the patient take larger breaths. Reassurance that the patient is not dying can help, but this is not possible in an execution. *Id.*

- An inmate executed via hypoxia likely "experiences severe air hunger and corresponding emotional distress, anxiety, physiological stress, and physical discomfort," but for "not significantly more than one to three minutes." *Id.* at 56.

### *Constitutionality of nitrogen hypoxia*

- While the protocol could result in dyspnea for up to three minutes, and while this could be uncomfortable or distressing, the Constitution does not guarantee a painless execution. "[A]ll executions presume a risk of some pain." *Id.* at 50.

- Clinical patients have described air hunger as "'worse than pain' because it is associated with the fear of death." But what doctors "take steps to avoid for their patients…is the very goal of an execution." *Id.* "For Eighth Amendment purposes, the anxiety evoked by air hunger—lasting not significantly more than one to three minutes—is more an 'inescapable consequence of death,' *Baze*, 553 U.S. at 50, than "'superadd[ed]" pain well beyond what's needed to effectuate a death sentence,' *Bucklew*, 587 U.S. at 136-37." *Id.* at 51.

- The protocol causes "physiological discomfort"—"even" discomfort that "may feel" akin to suffocation—but this is insufficient to prove an Eighth Amendment violation. What Lee alleges is not "physical pain like a broken bone." *Id.* at 52. The protocol's discomfort is similar to that of hanging. *Id.*

- Nitrogen hypoxia is not like the punishments considered cruel and unusual at the time of the founding. *Id.* "Instead, it is like hanging, firing squad, electrocution, and lethal injection, involving only the 'necessary suffering

14

involved in any method employed to extinguish life humanely.'" *Id.* at 52-53 (quoting *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947)).

**E.     Lee's appeal**

Following expedited briefing and oral argument, this Court reversed and remanded on June 8. Though it credited the district court's findings of fact, the Court disagreed with its conclusion and held that Lee had satisfied the first *Glossip* prong. *Lee*, 2026 WL 1651147, at *6.

> As intended, the protocol causes death by introducing pure nitrogen gas through a respirator mask until the inmate is declared dead. The district court found that an inmate executed under the protocol suffers one to three minutes of "severe air hunger and corresponding emotional distress, anxiety, physiological stress, and physical discomfort." *Lee*, 2026 WL 1493098, at *25. This mental distress, physiological suffering, and physical discomfort, the district court found, will likely take place. There is, in other words, a substantial risk of serious harm. The risk is not conjectural, speculative, or doubtful.

> The Eighth Amendment does not "guarantee a prisoner a painless death." *Bucklew*, 587 U.S. at 132. Yet at the Founding, "cruel" was "often defined to mean…'[d]isposed to give pain to others, in body or mind[.]'" *Id.* at 130 (quoting 1 Noah Webster, An American Dictionary of the English Language (1828) (first set of brackets in original)).

> In our view, the overall suffering described by the district court, which lasts for one to three minutes, presents a substantial risk of serious harm over and above death itself. Counting to 60 or 180 seconds is not a quick exercise, and constitutionally speaking, that timeframe is intolerable given the suffering that would likely take place under Alabama's nitrogen hypoxia protocol. Such suffering, we believe, is over and above the mental distress that typically accompanies the knowledge of impending death by execution.

*Id.* at *7. As the district court did not analyze the second *Glossip* prong, Lee's proposed alternative method of execution, this Court ordered the lower court to "immediately" do so. *Id.* at *8.

## F.    The remand

The district court entered a second memorandum order on June 9, concluding that "[o]n this record, and given the Eleventh Circuit's legal conclusion that the Protocol poses an unconstitutional risk of pain," Lee showed by a preponderance of the evidence that he had satisfied the second *Glossip* prong. DE187:2. Noting that Lee's version of firing squad resembled Utah's, *id.* at 3, the district court discussed the testimony of Dr. Williams, *id.* at 4-6, mentioning only in a footnote his late disclosure of his conflict, *id.* at 5 n.8.+

The court found that firing squad was feasible and readily implemented because "Lee drew up a blueprint for the State to follow that largely tracks Utah's current firing squad protocol." *Id.* at 8. The court also credited Dr. Williams's assertions that it was easy to accomplish a firing squad execution and that ADOC could find sufficient personnel to carry one out. *Id.* at 9.

The court then found, again based on Dr. Williams's testimony, that "death by firing squad is quick and painless, rendering the inmate unconsciousness in three to five seconds and before he can perceive any pain." *Id.* at 12. The court excluded the opinions of Dr. Antognini on this topic. *Id.* at 14-15. Comparing one to three

16

minutes of dyspnea to Dr. Williams's estimated nearly instantaneous death, the court found in favor of firing squad. *Id.* at 15-16.

Finally, the court rejected ADOC's penological reasons not to adopt firing squad, including the potential difficulties in reliably finding employees willing and qualified to participate and the problems ADOC might face in finding the materials necessary to carry out an execution by this method. *Id.* at 16-22.

Thus, the district court held that ADOC's nitrogen hypoxia protocol violated the Eighth Amendment and granted Lee's request for permanent injunction, prohibiting the State from executing him using the protocol. *Id.* at 25. Importantly, the district court readopted its findings of fact in its original memorandum opinion, which included its assumption that the level of "air hunger" it found to result from the protocol would be "the same throughout." DE176:28 n.26.

## SUMMARY OF THE ARGUMENT

The district court should be reversed for two reasons.

*First,* the lower court's factual findings as to Dr. Williams's opinion are clearly erroneous. Dr. Williams came to the stand with undisclosed bias, his opinions shifted throughout the litigation, and his claims as to ADOC's facilities and personnel are unsupported.

*Second,* the lower court's factual findings as to ADOC's legitimate penological reasons not to adopt firing squad are clearly erroneous and unsupported by the record.

Finally (and in the alternative), as Appellants have a substantial likelihood of success on the merits and the equities weigh in their favor, the Court should stay the district court's judgment pending appeal.

## STANDARD OF REVIEW: APPEAL FROM BENCH TRIAL

"On appeal from a bench trial, the district court's conclusions of law are reviewed de novo, but its findings of fact shall not be set aside unless clearly erroneous." *CompuLife Software v. Newman*, 959 F.3d 1288, 1301 (11th Cir. 2020); *see* FED. R. CIV. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").

18

**I.**     **The district court's factual findings as to Dr. Williams's opinions are clearly erroneous.**

Lee's expert as to firing squad was Dr. Williams, an ER physician who created a firearms training course. DE147:114; DE187:4. Despite Dr. Williams's clear bias—which neither he nor Lee mentioned to Appellants until the matter slipped on cross-examination—the district court largely credited his opinions, even when they shifted.

**A.     Dr. Williams's relationship with the Mahdi family**

At the outset—and though the district court treats it in a footnote—Dr. Williams failed to disclose a significant source of conflict: he had a relationship with the family of Mikal Mahdi, whose execution by firing squad in South Carolina went awry when the marksmen apparently missed. Dr. Williams was hired by the Mahdi family attorney, Gerald King, shortly after Mahdi's execution in early April 2025—nearly eleven months before he submitted his expert report in this case in March 2026. This relationship was not disclosed in Dr. Williams's expert report, was not disclosed during the *Boyd* litigation, another nitrogen hypoxia challenge in the Middle District of Alabama in which he testified, and was not disclosed at any point prior to cross-examination at trial. And it might have gone unnoticed but for the fact that Dr. Williams excluded any mention of South Carolina's firing squad

protocol from his report—curious, as South Carolina is responsible for the last three firing squad executions.

The circumstances of its disclosure speak volumes. When counsel first directed Dr. Williams to the forensic reports from the Mahdi execution, Dr. Williams interrupted the proceedings to inform the court that he was "currently retained by counsel for Mr. Mahdi and his estate" and was "enjoined from discussing any specifics of the case under attorney-client privilege." DE147:75. In other words, Dr. Williams's first instinct was to invoke privilege to shield himself from questioning about the very execution he had excluded from his analysis. Only after a recess and consultation with Lee's counsel did Dr. Williams reverse course and agree to answer questions, conceding that he had been "overly cautious" and "mistaken" about the scope of the privilege. *Id.* at 76, 79.

When asked whether his decision not to rely on the South Carolina protocol was influenced by his relationship with the Mahdi family, Dr. Williams denied it. But the circumstantial evidence is clear. Dr. Williams has been retained in a matter in which he may testify in future litigation against the State of South Carolina over the circumstances of Mahdi's execution. His financial and professional incentive is to characterize any problems with the Mahdi execution as the product of South Carolina's particular protocol choices—and emphatically not as evidence that firing squad as a general method is unreliable. Indeed, that is precisely the opinion

Dr. Williams offered: that whatever went wrong in South Carolina was a "glitch" that has no bearing on his sweeping conclusion that firing squad invariably produces a quick and painless death. *Id.* at 110.

A reasonable and disinterested expert, confronted with evidence that one of the most recent firing squad executions in the country produced the results documented in the Mahdi case, would at minimum have disclosed the conflict, considered the evidence, and grappled with its implications. Dr. Williams did none of these things. In light of his failure to disclose an obvious conflict—not only in this case but also in his previous appearance in Alabama—the district court's decision to credit his testimony without giving more than a footnote to this issue, DE187:5 n.8, is concerning to say the least.

### B. Dr. Williams's feasibility opinions

*First,* the district court summarily credited Dr. Williams's testimony about significant differences between the South Carolina and Utah protocols that render the former inferior. DE187:5 n.8 (citing DE147:55); *id.* at 19 (citing DE147:53). Far from finding support in the record below, Dr. Williams's claim of significant differences contradicts load-bearing elements of his testimony and expert report. The district court's conclusion that Lee's proposed firing squad alternative "significantly reduces a substantial risk of severe pain" rested in critical part on its determination that the 2025 Mahdi execution in South Carolina was an isolated anomaly

attributable to significant differences between Utah's and South Carolina's firing squad protocols. *See* DE187:19. But that determination is inconsistent with Dr. Williams's own testimony and expert report.

The district court noted, citing Dr. Williams, that South Carolina's protocol uses "fewer and different-caliber bullets" than the Utah protocol Lee proposes. DE187:19 (citing DE147:53). The court treated this as a meaningful distinction explaining why Mahdi's execution went wrong and why Lee's proposed alternative would not. This reasoning, however, is irreconcilable with two elements of Dr. Williams's expert opinion. To the extent that the distance at which marksmen fire is one of the potential structural differences between protocols, it is not here: Dr. Williams testified that a trained rifleman would be identically accurate at fifteen feet and twenty-one feet—the distances used in South Carolina and Utah, respectively. This testimony fatally undermines any suggestion that the distance differential is a constitutionally relevant variable explaining the Mahdi outcome. If marksmanship is indistinguishable across that range, then distance cannot account for the difference between an execution in which riflemen "largely missed" the heart and one in which they would not. The court cannot credit Dr. Williams's assurance that distance is ballistically irrelevant while simultaneously relying on protocol differences to quarantine the Mahdi execution as an anomaly inapplicable to Lee's case.

So too with alleged differences between ammunition caliber used in South Carolina and Utah. Dr. Williams's expert report stated that "any caliber of rifle in the service rifle category would be accurate enough" to carry out a firing squad execution effectively. If caliber is essentially interchangeable across the service-rifle category—a category that necessarily encompasses the rifles used in Utah and South Carolina—then the difference in caliber between the two protocols cannot fill the explanatory gap. The court relied on Dr. Williams's observation that South Carolina uses "different-caliber bullets" as a point of meaningful distinction, DE187:19, but Dr. Williams's own categorical conclusion strips that distinction of any significance. A protocol difference that Dr. Williams deemed irrelevant cannot serve as the district court's factual predicate for distinguishing a botched execution.

That reliance on the different calibers used in Utah and South Carolina is particularly problematic when viewed through the lens of Federal Rules of Evidence 703 and 705 and in light of the court's summary conclusion that "any prejudice to the State" resulting from Dr. Williams's non-disclosure "was ameliorated through vigorous cross-examination and probing questions." DE187:5 n.8. Appellants could not have conducted "vigorous cross-examination" of Dr. Williams's opinion that there were relevant differences between 6.5mm and .30 caliber ammunition because none of his materials provided any indication—and in fact, they were actively antagonistic to the idea—that Dr. Williams saw any relevant difference between any

of the "military or law enforcement grade rifle type[s] and caliber[s]" he concluded would be sufficient, DE173-40:18; *see* FED. R. CIV. P. 26(a)(2)(B)(i) (requiring "a complete statement of all opinions the witness will express and the basis and reasons for them"); FED. R. CIV. P. 37(c)(1) (forbidding any use any undisclosed information falling under Rule 26(a) or (e) unless the non-disclosure is "substantially justified or harmless"); *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 825 (11th Cir. 2009). Appellants could not have, in other words, anticipated Dr. Williams's eventual position that "***any*** military or law enforcement grade rifle type and caliber," DE173-40:18 (emphasis added), really meant "any military or law enforcement grade rifle type and caliber [***except 6.5mm ammunition***]."

The most specific protocol distinction Dr. Williams identified was that South Carolina uses three rounds of live ammunition instead of the four-round live volley Lee proposes. But Dr. Williams offered, and the district court required, no scientific literature, wound-ballistics data, or clinical explanation as the basis for his proposition that three live rounds directed at the heart produce a constitutionally different outcome than four. The relevance of the Mahdi execution cannot be dismissed with a summary distinction in light of the record facts indicating: (1) that at least one rifleman missed Mahdi's heart; (2) Mahdi remained conscious for approximately 30-60 seconds after being shot; and (3) the causal connection between the misplaced shot and time to death. These facts go to the heart of Dr. Williams's

opinions here. His entire theory of a quick and painless death depends on the premise that trained marksmen, firing at a target placed over a condemned's heart, will reliably strike the cardiac bundle, and consistently cause damage to the left ventricles and upper vessels sufficient to render the condemned unconscious within a matter of seconds. Against that backdrop, the district court should have rigorously examined Dr. Williams's assurances that Utah's protocol was sufficiently different than South Carolina's to render the Mahdi execution irrelevant. It instead adopted Dr. Williams's distinction without requiring him to explain—and without itself examining—why the number or caliber of bullets would have prevented the specific failure that allegedly occurred in Mahdi's case. Dr. Williams provided no basis in physiology or wound ballistics for why, if three rounds to the heart could fail to produce rapid unconsciousness, four rounds would reliably do so. The court accepted this distinction without demanding the supporting science that it did of the State's experts. *See* DE187:14-15. The absence of any principled basis for the three-versus-four-round distinction reflects an internal incoherence in Dr. Williams's own framework. The district court's function in a bench trial is to assess not only the credibility of witnesses but the logical integrity of their opinions.[12] A court commits

---

12. For instance, Dr. Williams disagreed with the assertion that one of the riflemen in the Mahdi execution missed the intended target. When asked how three bullets fired from three different rifles could have created only two entry and exit wounds (which are nearly identical in size), he opined that two bullets fired from two rifles and traveling on two trajectories could have converged at a singular point on Mahdi's

clear error when it accepts an expert's conclusion without examining whether that conclusion follows from the expert's own stated premises.[13]

The district court compounded its error by crediting and adopting Dr. Williams's dismissal of Mahdi's execution as "one purportedly botched execution out of forty-six firing squad executions in the United States since 1860." DE187:5; *see id.* at 19. As a general matter, the historical record of forty-six executions spanning over 160 years reveals very little about the reliability of modern firing squad protocols applied in correctional settings. Perhaps more fundamentally, the district court and Dr. Williams ignore that the Eighth Amendment's prohibition on cruel and unusual punishment cannot be reduced to the question of whether a particular method fails at a high enough rate to register as a pattern. It is instead sensitive to both the likelihood of something going wrong and the potential severity of the harm that results when something does. By reducing the inquiry to a frequency calculation, the district court misapplied *Glossip* and the relevant constitutional question. *See* 576 U.S. at 877.

---

chest to create a single entry wound and then merged their separate flight paths to create a single exit wound as they left Mahdi's body. DE147:96-97. Dr. Williams was undeterred by the fact that such a result would be, in his own words, "highly unlikely." *Id.* at 97-98. The district court described Dr. Williams's testimony, without qualification, as being "supported by science." DE187:15.

13. But even setting all that aside, Dr. Williams was at most equivocal about the relevance of his three-or-four-round distinction, admitting on cross-examination that "three riflemen could be sufficient." DE147:66.

Ultimately, the district court's failure to engage in any meaningful way with the gaps and inconsistencies in Dr. Williams's testimony rendered its finding at *Glossip*'s second prong clearly erroneous. *See* DE187:2-24.

***Second,*** the district court also credited Dr. Williams's opinion that firing squad executions could be readily carried out at Holman Correctional Facility. But Dr. Williams has never set foot in Holman, does not know the dimensions of the facility, cannot describe the layout of the existing execution chamber, and has no knowledge of how the chamber is oriented relative to the rest of the prison. Crediting that testimony as proof of feasibility was clear error. *See id.* at 9.

An expert opinion that lacks an adequate factual basis is entitled to no weight. *Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 157 (1999) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."). Where an expert's opinion is based on assumed facts that vary materially from those actually at issue, the opinion cannot support a trial court's factual finding. *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232-33 (11th Cir. 2009) (excluding expert testimony based on assumed facts lacking a "scientific connection to the pertinent inquiry"). Put differently, speculation dressed in the language of expert opinion remains speculation.

That principle governs here. Dr. Williams's opinion that Holman could be readily modified to accommodate a firing squad execution was not grounded in any site-specific knowledge. He acknowledged on cross-examination that he has never visited Holman, does not know the dimensions of its execution chamber, does not know how that chamber is oriented relative to the rest of the facility, and has no familiarity with the structural constraints that would govern any modification. DE147:111-12. His opinion that such modifications would be feasible was therefore untethered from the very facts necessary to support it.

The district court acknowledged that Lee's proposal requires modifying existing space at Holman to accommodate, at minimum: (1) a restraint chair, (2) stacked sandbags sufficient to absorb .30-caliber rifle fire, (3) a firing line between riflemen and the condemned as large as thirty-five feet, (4) structural reinforcement or ballistic barriers to prevent ricochets, and (5) a safe firing corridor that does not endanger adjacent areas of the prison. DE187:8. The feasibility of implementing each of those five components depends critically on the particulars of the physical space in which the execution would occur, particulars of which Dr. Williams admitted he is wholly ignorant: he does not know whether Holman's execution chamber is large enough to accommodate a thirty-five-foot firing corridor; he does not know whether the orientation of the chamber relative to adjoining cells, hallways, or occupied wings of the facility would create unacceptable safety hazards

28

from rifle fire or overpenetration; and he does not know whether the existing walls are structurally capable of supporting the necessary ballistic reinforcements without significant construction. DE147:110-11. These are precisely the kinds of basic questions that must be answered before an expert can reliably opine that a facility can be "readily" modified. *See Nance v. Comm'r, Ga. Dep't of Corr.*, 59 F.4th 1149, 1157 (11th Cir. 2023). And because Dr. Williams lacked knowledge of these basic facts, his assurance that the necessary modifications would be straightforward amounted to nothing more than a generalized assumption that any space can be made to work. That falls short of meeting Lee's burden. *See Bucklew*, 587 U.S. at 141-42.

The district court also could not have justifiably relied on testimony from former Commissioner Hamm and Deputy Commissioner Williams to fill any evidentiary gaps in Dr. Williams's conclusion that ADOC could modify the current chamber at Holman to carry out firing squad executions.

First, Commissioner Hamm and Deputy Commissioner Williams both conditioned their statements on legislative authorization that does not exist—a significant qualification that the court appears to have discounted. DE146:236, 256. Second, neither witness offered any engineering assessment, architectural review, or cost analysis supporting the conclusion that Holman could be adapted to accommodate the specific physical requirements of Lee's proposed firing squad protocol. Their testimony reflected a general willingness to comply with a

hypothetical legislative mandate, not an expert evaluation of whether the facility could, in practice, support the required modifications quickly and without undue burden. *E.g.*, *id.* at 229-30 ("Q. And if the Alabama legislature approved firing squad…could ADOC modify a space at Holman to carry out executions by firing squad? A. Certainly we could look into that."); *see Bucklew*, 587 U.S. at 141 (requiring that an alternative method be capable of being carried out "relatively easily and reasonably quickly"). Third, and most importantly, neither Commissioner Hamm nor Deputy Commissioner Williams testified with reference to the actual layout or dimensions of the execution chamber at Holman. Their assurances were just as untethered from site-specific facts as Dr. Williams's.

At bottom, none of the evidence on which the district court based its feasibility finding was sufficient to do so under this Court's or the Supreme Court's Eighth Amendment precedent. *Bucklew*, 587 U.S. at 141-42 (requiring proposed alternative be "sufficiently detailed" and rejecting proposals that lack specific answers to central questions of implementation). Dr. Williams testified generally that firing squad executions can be conducted indoors, that the required materials are commonly available, and that other states have successfully implemented such protocols, and Commissioner Hamm and Deputy Commissioner Williams testified in a similarly general fashion. But the relevant inquiry under *Bucklew* is not whether firing squad executions are feasible in the abstract, but whether *this* State can carry out *this*

alternative method at *the* facility where executions would occur. *See id.* It was Lee's burden to make that site- and State-specific showing. And by accepting general possibility as a substitute for specific proof of feasibility *in Alabama* and *at Holman*, the district court clearly erred.

## II. The district court's factual findings as to ADOC's penological reasons not to adopt firing squad are erroneous.

The State identified two legitimate penological reasons for not adopting firing squad. The district court erred by discounting both.

### A. Personnel concerns

First, adopting the Utah protocol would require ADOC to find five expert marksmen—in reality, more than that to account for absences and illness—willing and able to serve as executioners. This is a problem for the feasibility of the method, and it gives ADOC a penological reason to reject it.

Lee did not prove there are readily available personnel to serve this function, and neither Warden Raybon (DE147:163-64) nor former Commissioner Hamm (DE146:235) could identify five ADOC employees they believed would be sufficiently skilled and willing to carry out a firing-squad execution. This would make it difficult to use the method "quickly." *Bucklew*, 587 U.S. at 141; *see also id.* at 134 (personnel and staffing concerns are among the "many legitimate reasons why a State might choose, consistent with the Eighth Amendment, not to adopt a prisoner's preferred method of execution"); *cf. Glossip*, 576 U.S. at 878-79

31

(rejecting alternative where plaintiffs had "not identified any available drug or drugs that could be used"); *Boyd*, 2025 WL 2970017, at *5 (rejecting MAID on ground that obtaining drugs could be "difficult" and "finding the necessary personnel to administer them would be problematic").

At first, Dr. Williams opined that anyone who is APOSTC (Alabama Peace Officers' Standards and Training Commission) qualified "is…capable of performing a firing squad execution effectively." DE147:52. He then backtracked, admitting that the shooters would need to be more accurate than the minimum standard required, 80% proficiency. *Id.* at 112-13. But this is a gross understatement. According to the Utah protocol, all members of the firing squad must "demonstrate proficiency with weapons designed to carry out the execution," meaning that they must shoot each weapon from at least twenty-one feet under execution-like conditions and "accurately hit[ ] the target of the same dimension as that which will be attached to the condemned." Failure with any weapon is disqualifying. DE173-192:55.

The district court is correct that Commissioner Hamm and Deputy Commissioner Williams offered testimony about a hypothetical firing squad. DE187:18. Commissioner Hamm testified that ADOC could train its employees to use .30-caliber rifles if firing squad were approved by the legislature. DE146:229. Deputy Commissioner Williams likewise testified that hypothetically, if firing squad were approved, ADOC could train its employees to use .30-caliber rifles. *Id.* at 256-

57. But that testimony does not match the district court's conclusion: "Hamm and Charles Williams testified that the ADOC would be able to staff a firing squad execution team with five capable shooters." DE187:18. People can be trained to use rifles, but that does not make them sharpshooters or willing participants in a firing squad execution.

But even if ADOC officials could identify five employees willing and able to shoot an inmate exactly in the left ventricle, the State would have penological reason to reject a method so dependent on particular personnel. Conducting an execution by nitrogen hypoxia involves training, to be sure, but not five executioners with expert marksmanship. *See McGehee v. Hutchinson*, 854 F.3d 488, 493-94 (3d Cir. 2017) ("[Firing squad] requires trained marksmen who are willing to participate and is allegedly painless only if volleys are targeted precisely. The record comes short of establishing a significant possibility that use of a firing squad is readily implemented and would *significantly reduce* a substantial risk of severe pain."). One of the main reasons to adopt nitrogen hypoxia—aside from it being a quick and humane method—was to address the "supply concerns" that have made lethal-injection drugs unreliable. *See Price*, 920 F.3d at 1327; *Frazier*, 2025 WL 361172, at *13 (crediting State's penological reason of "turned to nitrogen hypoxia in part to 'implement[ ] a method that does not depend so heavily on external variables'"); U.S. Dep't of Just. Office of Legal Policy, Restoring and Strengthening the Federal

Death Penalty 28-30 (2026), www.justice.gov/ag/media/1437806/dl?inline (citing supply chain challenges among reasons to explore other methods, such as nitrogen hypoxia). If opponents of capital punishment could pressure major "pharmaceutical companies to refuse to supply the drugs" for lethal injection, *Glossip*, 576 U.S. at 870, it's no stretch of the imagination to think they could pressure individuals not to participate in firing-squad executions.[14] The district court's conclusion that "[t]he inability to compel participation apparently has not presented an issue in the past, and the State has identified no reason it would pose one now," DE187:17-18, ignores the real possibility that a pressure campaign against ADOC personnel could imperil the State's ability to carry out executions. Moreover, there is a difference between asking an employee to strap an inmate to the gurney or chaperone witnesses and asking him to take aim at the inmate's heart and fire.

Finding, training, and maintaining at all times at least *five* executioners would add new variables to the process beyond the State's control, which it has ample penological reason to reject. That exactly one other state (South Carolina) is currently conducting firing-squad executions does not defeat Alabama's "legitimate

---

14. *Cf.* Tr. 58:1-9, *Boyd*, 2:25-cv-00529 (M.D. Ala. Sept. 4, 2025), DE83 (testimony acknowledging that journalist purported to acquire fourteen names of execution team members); Brendan Kirby, *'Thou Shalt Not Suffocate'—Billboard Near Holman Prison Targets Corrections Workers*, Fox10 News (June 5, 2026, 6:38 PM), www.fox10tv.com/2026/06/05/thou-shalt-not-suffocate-billboard-near-holman-prison-targets-corrections-workers.

reason[s] for declining to adopt the protocol of another." *Bucklew*, 587 U.S. at 140; *accord McGehee*, 854 F.3d at 494 (rejecting alternative method argument in part because *only* one state was using firing squad at the time of plaintiff's claim).

Finally, ADOC has legitimate concerns over the problems that can occur when a firing squad execution goes wrong—"glitch[es]," as Dr. Williams testified, such as the Mahdi execution. DE147:110. The district court discounted this reason because Lee relied on the Utah protocol instead of the South Carolina protocol, DE187:19—but as discussed above, Dr. Williams's conclusions about the protocols are problematic. And while Dr. Williams opined that firing squad "rarely results in botched executions," *id.*, the fact that one in three in the last fifteen years (and one in four this century) has had a "glitch" is concerning to the State—even if it does not cause the method to violate the Constitution. *Contra* DE187:19.

## B.    Facility concerns

Second, ADOC does not presently have a facility appropriate for carrying out firing squad executions.

By law, executions are conducted at Holman Correctional Facility. ALA. CODE §15-18-82. That prison has a specific execution chamber set up to accommodate executions by any of Alabama's three statutory methods. A significant portion of the

facility has been decommissioned in recent years for safety reasons.[15] Commissioner Hamm and Warden Raybon testified that the execution chamber at Holman is not suitable for a firing squad execution, nor are the decommissioned areas of the prison. DE146:238-39; DE147:164-67. Lee's counsel visited the execution chamber, but Lee offered no evidence showing that the present facility is already safe or can readily and feasibly be made safe for an execution involving the firing of multiple high-powered rounds from a relatively short distance. Dr. Williams testified that for a safe firing-squad chamber, one would need to install ballistically impermeable barriers between witnesses and the chamber, impermeable ballistic protection for staff inside the chamber, bullet-resistant glass, cinderblock walls filled with concrete (or something comparable), and a means of catching bullets to stop them from ricocheting. DE147:54-55. And he assumed—based on nothing more than the fact that Utah has an execution chamber suitable for firing-squad executions—that Alabama can feasibly and readily retrofit its chamber. But as he admitted on cross-examination, he has never visited Holman, he has never seen the execution chamber, he does not know the dimensions of the chamber or its orientation to the rest of the facility, and he has never retrofitted an execution chamber to accommodate firing squad executions. *Id.* at 111.

---

15. *Holman Correctional Facility Decommissioning Status Updates*, ALA. DEP'T OF CORR., https://www.doc.alabama.gov/UpdatingNews.aspx (last visited June 10, 2026).

The district court interpreted ADOC's penological issue as "supply concerns," DE187:20, but the court misunderstood. "Supply concerns," as Appellants wrote below, *see* DE148:31-32 refers to the personnel issues discussed in the previous section, ***not*** to "rifles, ammunition, and the materials necessary to fortify an execution chamber, such as sandbags, lumber, and some form of a ballistic barrier," DE187:20. Appellants do not dispute that ADOC can procure guns, ammunitions, and building materials. The problem is that ADOC lacks an appropriate facility in which to employ them.

Commissioner Hamm testified that he believes the execution chamber is too small for a firing squad, explaining:

Q.     Do you believe it could be used for a firing squad execution?

A.     I think it's too small.

Q.     Any other reasons why or why not?

A.     I would—yeah. I mean, just—I think it would probably not—be cost prohibitive to try to retrofit or remodel that, because we still have electrocution, lethal injection, nitrogen hypoxia, so all those methods are still available. So I don't think it could be retrofit to where you could have a firing squad and conduct those other three executions if so selected.

DE146:238. And while he thought there might be another location at Holman that could be used for a firing squad, he added, "Now, there's a lot of planning that would have to go into it. I think it would probably have to be constructed.…We would have to actually build probably a structure, would probably be the best choice." *Id.* at 238-

39. In other words, he did not believe there is presently a building on the property suitable for this method of execution.

Warden Raybon testified that the walls of the execution chamber are constructed of cinderblocks, and he did not believe they were reinforced with concrete or rebar. DE147:165. He testified that the decommissioned portion of Holman is not fortified with things like bulletproof glass and that there are security concerns with its use. *Id.* at 167. As for expanding the execution chamber, he testified, "It could be expanded, but you would have to—there would have to be some other modifications made in order to be able to continue to do what we do there with lethal injection, as well as the nitrogen and the electrocution is still part of the methods." *Id.* at 166. In sum, he did not believe there is a facility presently at Holman safe and suitable for firing squad.

Adopting firing squad is not as simple as buying guns and giving employees a few more hours at the range. ADOC has genuine concerns about identifying a sufficient number of employees willing and able to participate in a firing squad and spending the time and money to construct a facility suitable for that purpose. And this also supports to Appellants' contention that firing squad is not readily implemented. As the *Bucklew* Court noted, "readily implemented" means "the inmate's proposal must be sufficiently detailed to permit a finding that the State

could carry it out 'relatively easily and reasonably quickly.'" 587 U.S. at 141 (quoting *McGehee*, 854 F.3d at 493). Lee failed to prove that ADOC can do so.

***

For the foregoing reasons, the district court should be reversed and judgment granted to Appellants.

In determining whether to stay a lower court's decision pending appeal, this Court will consider: "(1) whether the stay application has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hand v. Scott*, 888 F.3d 1206, 1207 (11th Cir. 2018) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009) (further quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). "The first two factors are the 'most critical.'" *Id.* (quoting *Nken*, 556 U.S. at 434.

## ARGUMENT

### I.     Appellants are likely to succeed on the merits.

In the interest of brevity, Appellants incorporate by reference their merits arguments set forth above, noting again that the Supreme Court has never invalidated a state's chosen method of execution—not hanging, firing squad, electrocution, cyanide gas, or lethal injection, all of which carry real risks of physical pain. Nitrogen hypoxia, which, in the district court's estimation, may lead to one to three minutes of dyspnea and some resulting distress, DE176:56, does not violate the Eighth Amendment, nor is it a more painful method of execution than firing squad.

The district court erred in its fact-finding by crediting Dr. Williams's unsupported opinions, particularly where he hid his bias until cross-examination forced it from him, and by discounting ADOC's legitimate penological reasons for not adopting firing squad. For the reasons set forth *supra*, Appellants have established a substantial likelihood of success on the merits.

**II.     The balance of the equities demands a stay.**

Considering the other three stay factors, which go to the equities, the balance favors Appellants.

*First,* Appellants—and the State more broadly—will be irreparably injured if ADOC is not permitted to carry out Lee's lawful sentence on June 11. Lee has been on death row since 2000. His victims' families have waited more than a quarter-century for justice. Allowing Lee to avoid his execution date would undermine the powerful interest—shared by the State, the public, and the victims in this case and their families—in timely enforcement of that sentence. *See Hill v. McDonough*, 547 U.S. 573, 584 (2006). Any unpunished murder is an intrinsic and ongoing harm to those interests and to the rule of law more generally. "Only with real finality" can we "move forward knowing the moral judgment will be carried out." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). "To unsettle those expectations" in this case would "inflict a profound injury to…the State and the victims of crimes alike." *Id.* The State has a "legitimate interest in carrying out a sentence of death in a timely

manner," *Baze*, 553 U.S. at 61 (counting fourteen years from sentencing against stay of execution), and it should be permitted to do so.

***Second,*** death does not count as an irreparable harm to Lee. If it did, then every inmate with a pending execution would automatically satisfy this element. On the contrary, punishing the guilty fulfills the public's "moral judgment," *Calderon*, 523 U.S. at 556, and carrying out a lawful sentence inflicts no irreparable harm.

***Third,*** the equities in general favor Appellants because Lee's present litigation shows that he is less interested in choosing a constitutional method of execution than he is in causing delay. Lee admitted that he elected nitrogen hypoxia in 2018 because he was involved in a lawsuit about lethal injection. DE173-203:23; *see* Joint Motion to Dismiss, *Lee v. Dunn*, 1:16-cv-00473 (S.D. Ala. July 19, 2018), DE37. At that time, Lee knew or reasonably should have known that he would be required to breathe nitrogen gas until he lost consciousness and died. By electing, he gained a de facto moratorium on his execution until ADOC could design and implement a nitrogen hypoxia protocol, a process that took more than five years. Lee sat back and watched as five Alabama inmates and one Louisiana inmate were executed by hypoxia, and only then, three days before his limitations period ran, did he initiate the present lawsuit. Asked why he waited so long, all Lee could offer was, "I really don't have an answer why because I just knew that I had to have it filed by August." DE173-203:22. In other words, delay.

Lee's actions show that he was and remains "more interested in delaying [his] execution[ ] than in avoiding unnecessary pain." *See Middlebrooks v. Parker*, 22 F.4th 621, 628 (6th Cir. 2022) (Thapar, J., statement) (citing *Bucklew*, 587 U.S. at 140). Lee has suggested that something has changed since his election, but nothing has changed that matters for his constitutional claim, which is that "conscious suffocation" (i.e., oxygen deprivation) is "a constitutionally unacceptable risk." *E.g.*, DE149:130. If that assertion were true and applicable to nitrogen hypoxia today, then so it was when Lee first elected the method.

Lee's choice to plead firing squad—a method unauthorized under Alabama law—should bolster the Court's conclusion further still. If Lee were concerned about the chance of distress from nitrogen hypoxia, he had two other constitutional methods to choose from: lethal injection or electrocution. Instead, he elected a method he did not want, and he waited to sue. *Cf. Price v. Comm'r*, 920 F.3d 1317, 1329 (11th Cir. 2019) (acknowledging "the potential for abuse in delaying execution that a state's decision to make multiple methods of execution available could present"). Lee chose an unauthorized method, Appellants submit, precisely because if successful, it would *not* be a "pathway forward," *Nance*, 597 U.S. at 169, and the execution could not proceed "as scheduled," *Nelson v. Campbell*, 541 U.S. 637, 646 (2004).

What's more, Lee knows it hurts to be shot. He shot Jimmy Ellis in the chest and Elaine Thompson in the head, of course, but even beyond the crime that landed him on death row, Lee admitted he has experience in this area:

Q. Have you ever witnessed anyone getting shot?

A. Yes.

Q. Okay. And how did they react?

A. Like it hurt.

Q. Okay. Did they scream or moan?

A. Yes.

Q. Have you ever been shot?

A. No.

Q. Have you ever had to care for anyone—or not directly, but like a friend or somebody that is recovering from a gunshot wound?

A. Yes.

Q. And how was that?

A. It wasn't good.

Q. Pretty painful?

A. Yes.

DE173-203:30-31. Appellants have no doubt that were ADOC to adopt Utah's firing squad protocol today, Lee would sue and claim it is unconstitutional.

Method-of-execution litigation is a game to inmates like Lee—a high-stakes game, to be sure, but a game nonetheless. And every time an inmate is allowed to evade justice, citizens and victims of crime suffer.

## CONCLUSION

The Court should reverse the judgment of the district court and lift the injunction prohibiting ADOC from executing Lee by nitrogen hypoxia, or in the alternative, should stay the judgment of the district court.

Respectfully submitted,

STEVE MARSHALL
ATTORNEY GENERAL OF ALABAMA
BY—

A. Barrett Bowdre
*Solicitor General*

Robert M. Overing
*Principal Deputy Solicitor General*

*/s/ Lauren A. Simpson*
Lauren A. Simpson
*Deputy Attorney General*

Polly S. Kenny
Talmadge Butts
Brenton Thompson
*Assistant Attorneys General*

Counsel for Appellants

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitations set forth in FED. R. APP. P. 32(a)(7)(B)(i) because it contains 10,384 words, including all headings, footnotes, and quotations, and excluding the parts of the brief exempted under FED. R. APP. P. 32(f) and 11th Cir. R. 32-4.

2. In addition, this brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

*/s/ Lauren A. Simpson*
Lauren A. Simpson
*Deputy Attorney General*
*Counsel for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2026, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will serve electronic notice upon counsel of record.

/s/ *Lauren A. Simpson*_____
Lauren A. Simpson
*Deputy Attorney General*
State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130-0152
(334) 242-7300
Lauren.Simpson@AlabamaAG.gov