In the

# United States Court of Appeals

## For the Eleventh Circuit

———————————

No. 26-12027

———————————

JEFFERY LEE,

*Plaintiff-Appellee,*

*versus*

COMMISSIONER, ALABAMA DEPARTMENT OF
CORRECTIONS,
WARDEN, HOLMAN CORRECTIONAL FACILITY,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:25-cv-00680-ECM

———————————

Before JORDAN, LUCK, and KIDD, Circuit Judges.

BY THE COURT:

In *Lee v. Commissioner*, No. 26-11864, 2026 WL 1651147 (11th
Cir. June 8, 2026) (*Lee II*), we held, based on the district court's fac-
tual findings following a bench trial, that Alabama's nitrogen hy-
poxia protocol, *see* Ala. Code § 15-18-82.1, presents a "'substantial

risk of serious harm'—severe pain over and above death itself." *Lee II*, 2026 WL 1651147, at *8 (quoting *Glossip v. Gross*, 576 U.S. 863, 877 (2015)). As a result, we concluded that Jeffery Lee had satisfied the first prong of his Eighth Amendment challenge under *Glossip*. We remanded to the district court to address the second prong of *Glossip* based on the evidence that the parties had presented at trial.

On remand, the district court found that the firing squad is a feasible alternative that is readily implemented, that the firing squad would significantly reduce the risk of harm posed by Alabama's nitrogen hypoxia protocol, and that Alabama does not have a valid penological reason for rejecting the firing squad. The district court entered a permanent injunction prohibiting Alabama from executing Mr. Lee through the nitrogen hypoxia protocol. It also denied the Commissioner's motion to stay the injunction.

The Commissioner of the Alabama Department of Corrections has appealed, and seeks an emergency stay of the district court's permanent injunction so that it can execute Mr. Lee by nitrogen hypoxia tomorrow or Friday. Following review of the parties' briefs, the record, and the district court's orders, we deny the Commissioner's motion.

## I

In 2000, a jury convicted Mr. Lee of two counts of capital murder, and attempted murder, after a two-day trial. *See Lee v. State*, 898 So. 2d 790, 807 (Ala. Crim. App. 2001). The trial court overrode the jury's recommendation of life and sentenced him to death. *See id.*

Mr. Lee exhausted his direct and collateral appeals. He then sought to challenge Alabama's lethal injection protocol as violative of the Eighth Amendment, *see Lee v. Dunn*, 731 F. App'x 885 (11th Cir. 2018), but that action became moot when Mr. Lee elected to be executed by nitrogen hypoxia, which the Alabama Legislature authorized in 2018. *See Lee v. Dunn*, No. 16-473, D.E. 38 (order granting joint motion to dismiss) (S.D. Ala. July 20, 2018).

"Nitrogen hypoxia, as set out in Alabama's protocol, causes death by introducing pure nitrogen gas to the condemned inmate through an industrial-use respirator mask until the inmate is declared dead." *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894, 896 (11th Cir.) (internal quotation marks omitted and alteration adopted), *cert. denied sub nom. Grayson v. Hamm*, 145 S. Ct. 586 (2024). In August of 2025, Mr. Lee brought this action under 42 U.S.C. § 1983, seeking to prevent the State from executing him using nitrogen hypoxia on the ground that this method violates the Eighth Amendment's prohibition on cruel and unusual punishment. At that time, no execution date had been set for Mr. Lee. In his amended complaint, Mr. Lee proposed that execution by firing squad is a feasible and readily implemented alternative method that would significantly reduce the substantial risk of severe pain associated with nitrogen hypoxia.

On February 9, 2026, the State moved the Supreme Court of Alabama to set Mr. Lee's execution. The Governor later set a 30-hour time frame for the execution, beginning at 12:00 a.m. on

Thursday, June 11, 2026, and ending at 6:00 a.m. on Friday, June 12, 2026.

From April 27 to April 29, 2026, the district court held a bench trial, at which it heard the testimony of eleven witnesses and admitted hundreds of exhibits. The district court assessed Mr. Lee's Eighth Amendment claim under the test set out in *Glossip*, 576 U.S. at 877–81—requiring an inmate to show (1) that a challenged method of execution presents a substantial risk of severe harm and (2) that there is "a feasible and readily implemented alternative method . . . that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew v. Precythe*, 587 U.S. 119, 134 (2019).

The district court found that an inmate executed under the protocol "experiences severe air hunger and corresponding emotional distress, anxiety, physiological stress, and physical discomfort." *Lee v. Lovelace*, No. 25-cv-680, 2026 WL 1493098, at *25 (M.D. Ala. May 28, 2026) (*Lee I*). The district court also found that an inmate "consciously experiences air hunger and associated distress for not significantly more than one to three minutes." *Id.*[1]

---

[1] "Dyspnea is a medical term for breathing difficulty or breathing discomfort." *Lee I*, 2026 WL 1493098, at *24. "The most severe form of dyspnea is 'air hunger,' the sensation of needing to take in more air." *Id.* "For many people, air hunger causes extreme emotional distress, panic, anxiety, and fear because breathing is essential to human life." *Id.*

On these factual findings, the district court held that Mr. Lee had "failed to show by a preponderance of the evidence that the [Alabama] nitrogen hypoxia execution protocol causes severe pain or suffering 'well beyond what's needed to effectuate a death sentence.'" *Id.* at *25 (quoting *Bucklew*, 587 U.S. at 137). Because it reached this conclusion, the district court did not address Mr. Lee's proposed alternative of execution by firing squad. *See id.* at *22.

Mr. Lee immediately appealed the district court's judgment, and sought a stay of execution. *See Lee II*, 2026 WL 1651147, at *2. We expedited briefing, heard oral argument by videoconference on June 5, 2026, and reversed the district court's determination of substantial risk of severe pain on June 8, 2026. *See id.*

We concluded that, based on "the facts found by the district court, Alabama's nitrogen hypoxia protocol presents a substantial risk of serious harm—severe pain over and above death itself." *Id.* at *8 (internal quotation marks and citation omitted). We reasoned that suffering "one to three minutes of severe air hunger and corresponding emotional distress, anxiety, physiological stress, and physical discomfort" is sufficient to satisfy the first prong of the *Glossip* standard. *See id.* at *7 (internal quotation marks omitted).

We could not, however, resolve the second prong of the *Glossip* standard because the district court "did not address whether Mr. Lee had shown that the firing squad was a feasible and readily implemented alternative method that would significantly reduce the risk of harm." *Id.* at *8. We therefore "remand[ed] the case to the district court with instructions to immediately address the

second prong of *Glossip*," and issued the mandate together with the opinion. *See id.* And "because we [could not] make a determination about likelihood of success on that prong on this record, we [denied] without prejudice Mr. Lee's [ ] motion for a stay of his execution." *Id.*

On remand, the district court immediately addressed the second prong, ruled that the firing squad was a feasible and readily-implemented alternative method of execution, and entered a permanent injunction and final judgment in favor of Mr. Lee. The Commissioner moved the district court to stay its injunction pending appeal, but the district court denied that request, explaining that the Commissioner had not shown a likelihood of success on the merits or that the equities favored a stay of the injunction. *See* Fed. R. App. P. 8(a)(1); Fed. R. Civ. P. 62(d).

## II

The Commissioner has now filed a motion asking us to stay the district court's permanent injunction pending appeal, thereby permitting the State to execute Mr. Lee by nitrogen hypoxia. A motion to stay a permanent injunction is governed by the stay factors from *Nken v. Holder*, 556 U.S. 418, 426 (2009). *See Hand v. Scott*, 888 F.3d 1206, 1207 (11th Cir. 2018). *Accord Rose v. Raffensperger*, 143 S. Ct. 58, 59 (2022) (analyzing emergency motion to stay the district court's permanent injunction pending appeal).

We may grant a stay pending an appeal on the merits only if the stay applicant establishes that (1) it has a substantial likelihood of success on the merits, (2) it will suffer irreparable injury unless

the stay issues, (3) the stay would not substantially harm the other litigant, and (4) if issued, the stay would not be adverse to the public interest. *See Barwick v. Governor of Fla.*, 66 F.4th 896, 900 (11th Cir. 2023). "A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken*, 556 U.S. at 433. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–44. In assessing a motion for stay, we do not definitively address the merits. *See Robinson v. Att'y Gen.*, 957 F.3d 1171, 1177 (11th Cir. 2020); *Ritter v. Smith,* 726 F.2d 1505, 1512 n.17 (11th Cir. 1984).

A district court's decision to grant permanent injunctive relief is reviewed deferentially for abuse of discretion. *See Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1221 (11th Cir. 2017). "By definition . . . under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call." *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc) (citation omitted). "That is how an abuse of discretion standard differs from a *de novo* standard of review." *Id.* (citation omitted).

As a general matter, factual findings are reviewed for clear error. *See Glossip*, 576 U.S. at 881; *Mills v. Hamm*, 102 F.4th 1245, 1248 (11th Cir. 2024). That means that a finding "that is 'plausible' in light of the full record—even if another is equally or more so— must govern." *Cooper v. Harris*, 581 U.S. 285, 293 (2017). *See also Bucklew v. Precythe*, 883 F.3d 1087, 1094 (8th Cir. 2018) (stating that

the factual findings regarding a proposed alternative method of execution are reviewed for clear error), *aff'd*, 587 U.S. 119 (2019).

Once the underlying facts are determined, whether the second prong of *Glossip* is met is a question of law. *See id.* We review legal questions *de novo.* *See Nance v. Comm'r, Ga. Dep't of Corr.*, 169 F.4th 1312, 1317 (11th Cir. 2026).

### III

The second prong of *Glossip* requires Mr. Lee to "show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew*, 587 U.S. at 134. "Distinguishing between constitutionally permissible and impermissible degrees of pain . . . is a necessarily comparative exercise." *Id.* at 136 (emphasis and citations omitted). "To decide whether the State has cruelly 'superadded' pain to the punishment of death isn't something that can be accomplished by examining the State's proposed method in a vacuum, but only by 'compar[ing]' that method with a viable alternative." *Id.* (brackets omitted). "An inmate seeking to identify an alternative method of execution is not limited to choosing among those presently authorized by a particular State's law." *Id.* at 139–40.

### A

"[T]o establish that a proposed alternative method is available, an inmate must do more than show that it is theoretically feasible; he must also show that it is readily implemented." *Price v. Comm'r, Ala. Dep't of Corr.*, 920 F.3d 1317, 1327 (11th Cir. 2019)

(internal quotation marks omitted). "To meet this burden, the inmate's proposed alternative must be sufficiently detailed to permit a finding that the State could carry it out relatively easily and reasonably quickly." *Id.* (internal quotation marks omitted). In addition, an inmate "cannot make a successful challenge by showing a slightly or marginally safer alternative." *Id.* In other words, "[a] minor reduction in risk is insufficient; the difference must be clear and considerable." *Bucklew*, 587 U.S. at 143.

Finally, the State "may refuse to adopt a prisoner's proposed alternative method of execution for a legitimate penological reason." *Nance v. Comm'r, Ga. Dep't of Corr.*, 59 F.4th 1149, 1155–56 (11th Cir. 2023) (citing *Bucklew*, 587 U.S. at 143–44).

Mr. Lee asserted that execution by firing squad is a feasible, readily implementable, and a substantially less painful (i.e., less severe) alternative within the meaning of the Eighth Amendment. Five states authorize execution by firing squad. Mr. Lee proposes a protocol, similar to Utah's, in which the firing squad is comprised of five trained marksmen, one of whom is the firing squad team leader. He suggests that the firing squad be set up at a distance of 21 feet from the inmate, armed with .30-caliber rifles. He proposes that one of the rifles be loaded with blanks so that it is unknown which firing squad member fires a fatal shot.

In Mr. Lee's proposal, the warden or his designee would give an order to fire. The firing squad team leader would then ready the weapons in a controlled and safe manner. After the first volley, the protocol shifts based on whether the prisoner is conscious. If the

prisoner appears to be unconscious, the medical examiner enters the execution chamber and checks the prisoner's vital signs. If vital signs are detected, the firing squad would fire a second volley. Alternatively, if the prisoner is obviously conscious after the first volley, the warden or his designee would immediately instruct the first squad team leader to prepare the weapons and fire again.

### B

On June 9, 2026, on remand and based on the testimony and evidence presented at the bench trial, the district court entered final judgment in favor of Mr. Lee on the second prong of the *Glossip* test, and permanently enjoined the State from executing him via nitrogen hypoxia. As explained below, the district court reviewed all the evidence adduced at the bench trial and weighed the credibility of witnesses.

Specifically, Mr. Lee introduced the testimony of Dr. James Williams, an emergency physician with expertise in gunshot wounds, firearms, and ballistics. The district court found that "Dr. Williams testified to a reasonable degree of medical certainty that execution by firing squad: (1) causes a quick and painless death; and (2) is feasible and readily implemented." D.E. 187 at 4.

Dr. Williams testified that "an execution by firing squad directed at the cardiac bundle—the area of the body that includes the heart and great vessels—will very likely cause immediate disruption of blood flow to the brain, resulting in loss of consciousness within three to five seconds and death shortly thereafter." *Id.* at 5 (footnote omitted). He further explained that, in his opinion, "an

inmate shot in the heart is unlikely to feel pain in the three to five seconds before he loses consciousness" because of "two related phenomena: (1) the delay in the brain's processing of novel stimuli into a subjective experience such as pain; and (2) the effects of 'neural stunning.'" *Id.* The district court found that "Dr. Williams' testimony is credible, persuasive evidence that an inmate executed by [Mr.] Lee's proposed firing squad protocol would experience no pain." *Id.* at 15.

Significantly, the district court rejected the testimony of Dr. Joseph F. Antognini, the Commissioner's expert, about the firing squad. It recounted that it had excluded some of Dr. Antognini's trial testimony because he "conceded that nothing in his expert report supported his contention that an inmate executed by firing squad would consciously suffer severe pain for eight to ten seconds after bullet entry." *Id.* at 14.

Moreover, the district court found that his—and the Commissioner's—reliance on the "botched" firing squad execution of Mikal Mahdi in South Carolina was misplaced for two reasons. *Id.* at 5, 14–15, 19. First, Mr. "Lee's proposed method relies heavily on Utah's protocol, which is meaningfully different than South Carolina's." *Id.* at 19. "Second, assuming without deciding that Mahdi's execution was 'botched,' an 'isolated mishap alone' does not render the firing squad constitutionally suspect" given the other testimony about the efficacy of the firing squad. *Id.*

The district court also addressed the State's purported penological reasons for refusing to implement the firing squad: (1) the

inability to source volunteers willing and capable of serving in a firing squad; and (2) the potential inability to procure materials used in firing squad executions. The district court found that the testimony at trial was contrary to these two asserted reasons and credited the testimony of the former Commissioner himself that the Alabama Department of Corrections "would be able to staff a firing squad execution team with five capable shooters." *Id.* at 18. And "Dr. Williams and the State's own witnesses testified that the materials required to carry out an execution by firing squad could be readily procured." *Id.* at 21 (emphasis omitted).

Thus, the district court made the ultimate factual finding that Mr. Lee's "proposed firing squad alternative, involving four .30-caliber bullets fired at the heart, renders an inmate unconscious in three to five seconds." *Id.* at 23. "Due to the related phenomena of delayed brain processing and neural stunning, an inmate executed under [Mr.] Lee's firing squad alternative is rendered unconscious before his brain can process any pain." *Id.* Mr. Lee's proposed alternative method, therefore, "produces a quick and painless death." *Id.*

Regarding the feasibility and ease of implementation, the district court found that "[t]he State can readily obtain rifles, ammunition, and other materials necessary to carry out a firing squad execution." *Id.* "Additionally, the State would be able to modify space at Holman to carry out executions by firing squad." *Id.* "The State is also able to source and train volunteers willing to carry out such an execution." *Id.*

Given these factual findings, the district court concluded that Mr. "Lee has shown by a preponderance of the evidence that his proposed firing squad alternative is feasible, readily implemented, and significantly reduces the substantial risk of serious harm posed by" the nitrogen hypoxia protocol. *Id*. at 24. The district court therefore entered a permanent injunction, prohibiting the State from executing Mr. Lee using the nitrogen hypoxia protocol.[2]

## C

The Commissioner has not made a substantial showing that the district court clearly erred in its factual findings. These findings, amply supported by the evidence presented, establish that Mr. Lee demonstrated that execution by firing squad is a feasible, readily implementable, and significantly less painful alternative to nitrogen hypoxia. On initial review, we find plausible the factual findings underlying the "necessarily comparative exercise" between the potential for three minutes of severe air hunger caused by nitrogen hypoxia and the upper limit of five seconds for the inmate to be "rendered unconscious *before* his brain can process any pain" due to the neural stunning and novel stimuli reaction. *See* D.E. 187 at 23 (emphasis added). *See also Cooper*, 581 U.S. at 293 ("A finding that is

---

[2] The district court did not grant Mr. Lee's requested relief in full. Mr. Lee had asked to enjoin the State from executing him by "any method *other than one of the alternatives provided by his attorneys*." D.E. 40 at 23 (emphasis added).

'plausible' in light of the full record—even if another is equally or more so—must govern.") (citation omitted).[3]

The Commissioner is not substantially likely to succeed on his argument that the district court clearly erred by crediting Dr. Williams' extensive testimony over that of Dr. Antognini. We "accept the factfinder's choice of whom to believe unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *United States v. Braddy*, 11 F.4th 1298, 1313 (11th Cir. 2021) (internal quotation marks and citation omitted). When it is faced with a choice between "dueling experts," a district court does not clearly err by crediting one expert (here Dr. Williams) over another (Dr. Antognini) because that choice is "reasonably based on evidence found in the record." *United States v. Stein*, 964 F.3d 1313, 1322 (11th Cir. 2020). *See also Grayson*, 121 F.3d at 900. Simply put, Dr. Antognini's opinion—that "for the 8 [to] 10 seconds of consciousness after bullet entry, the injury would be severely painful, especially related to shattering of bone and damage to the spinal cord"—lacks supporting authority. *See* D.E. 173-141 at 26. In contrast, the record supports Dr. Williams' vast experience and well-sourced expert opinion.

The Commissioner continues to question Dr. Williams' credibility in his appeal, but the district court denied his motion to

---

[3] The Commissioner's contention that Mr. "Lee knows it hurts to be shot" because he has witnessed shootings is irrelevant to the district court's factual findings. *See* Br. for Appellants at 44.

strike, and he does not meaningfully argue why this evidentiary ruling was an abuse of discretion. In particular, the Commissioner fails to specifically address how Dr. Williams' previous consultation with the Mahdi family weighs on his ultimate conclusions about the three to five seconds to unconsciousness, or the neurological delay in the inmate registering the pain or undermines the studies on which Dr. Williams relies.

Dr. Williams' opinion makes the record in this case unlike the record in *Hoffman v. Wescott*, 131 F.4th 332, 336 (5th Cir. 2025), where "experts for both parties agreed that death by firing squad can cause pain." On this record, the Commissioner has not shown a strong likelihood of success. Based on the three to five seconds to unconsciousness and the neurological delay in the inmate registering the pain, we agree that execution by firing squad significantly reduces the risk of severe harm posted by execution by nitrogen hypoxia. *See also Arthur v. Dunn*, 580 U.S. 1141, 1154 (2017) (Sotomayor, J., joined by Breyer, J., dissenting from denial of certiorari) ("[T]he available evidence suggests 'that a competently performed shooting may cause nearly instant death.' In addition to being near instant, death by shooting may also be comparatively painless.") (citation omitted).[4]

---

[4] The Commissioner does not confront the parties' agreement to admit Dr. Brian McAlary's declaration testimony from two previous nitrogen asphyxiation challenges. Dr. McAlary stated that execution by firing squad is "significantly more humane" than execution by nitrogen hypoxia. *See* D.E. 173-19 ¶ 34. He explained that there is objective evidence and relevant literature demonstrating that "the loss of consciousness is nearly instantaneous with the

Moreover, the Commissioner has not substantially shown that any difficulties with retrofitting an execution chamber and assembling a team of five marksmen would make this method unfeasible or unimplementable. We have said that, to meet his burden, "a petitioner can identify a well-established protocol in another State as a potentially viable option." *Price*, 920 F.3d at 1326 (internal quotation marks omitted). Mr. Lee admitted into evidence Utah's firing squad protocol, and the district court credited his expert's testimony examining how a similar protocol would be feasible in Alabama.

The Commissioner's arguments on feasibility amount to a suggestion that if a State would need time and resources to implement a protocol for an alternative method, then that method is not feasible. But if that were the test, then, *Bucklew*'s statement that an inmate "is not limited to choosing among those presently authorized by a particular State's law," 587 U.S. at 140, would be rendered meaningless.

As the district court explained, "the State concedes that it can procure guns and ammunition of a variety of calibers" and "materials such as bullet-proof glass are commonly used in construction, thus undermining any supply chain concerns." D.E. 187 at 21 (internal quotation marks omitted). And "even if the [State] chose to use marksmen who were more skilled than required," the court credited the testimony that Alabama "would be able to staff

---

impact of the projectiles" and death criteria are present "within a minute." *See id.* ¶ 33.

a firing squad execution team with five capable shooters." *Id.* at 18. These findings do not appear to be erroneous, much less clearly so.[5]

## III

It goes without saying that Mr. Lee would suffer irreparable harm if he were executed pursuant to a method that the district court has found unconstitutional. To him, loss of life is not compensable by legal remedies like damages. *See Ne. Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."). *Cf. Ramirez v. Collier*, 595 U.S. 411, 433 (2022).

We recognize, of course, that the State has a "significant interest in meting out a sentence of death in a timely fashion." *Nelson v. Campbell*, 541 U.S. 637, 644 (2004). But the State's arguments concerning delay, on this record, are not well taken.

---

[5] The Commissioner faults the district court for crediting Dr. Williams' testimony on feasibility because "he has never visited Holman, does not know the dimensions of its execution chamber, does not know how that chamber is oriented relative to the rest of the facility, and has no familiarity with the structural constraints that would govern any modification." Br. for Appellants at 27. As we have explained, however, the district court relied on the testimony of others witnesses who were familiar with Holman—for example, the Commissioner himself. Even so, it is unclear to us how Dr. Williams' testimony about, for example, the common-sense availability of firearms and bullet-proof glass would require him to have visited the facility.

Mr. Lee filed his nitrogen hypoxia challenge within the statute of limitations, and the State chose to set Mr. Lee's execution date while the parties were in active litigation. Indeed, Mr. Lee filed his lawsuit on the same day (August 22, 2025) as seven other Alabama death row inmates claiming the protocol violated the Eighth Amendment. *See In Re: Alabama Nitrogen Hypoxia Protocol Litigation*, 2:24-cv-111-ECM (M.D. Ala.). Mr. Lee's case was briefly consolidated with those cases.

On January 14, 2026, however, the State notified the district court, Mr. Lee, and Mr. Lee's counsel—for the first time—that Mr. Lee was the next person for whom the State would move to set an execution date. Two weeks later, on January 28, 2026, the State represented that it anticipated moving to set Mr. Lee's execution date by mid-February. The next day, on January 29, 2026, the district court deconsolidated Mr. Lee's case and set it on a separate, expedited schedule for the bench trial in late April.

On February 9, 2026, the State moved the Supreme Court of Alabama to authorize Mr. Lee's execution. On April 15, 2026, the Governor set the execution for a date less than two months away. After the late April bench trial, the district court issued its findings of fact and conclusions of law on May 28, 2026. Mr. Lee sought relief from this Court immediately.

Any delay in obtaining relief after the State moved to set the execution date is not attributable to Mr. Lee. *Cf. Dunn v. Ray*, 586 U.S. 1138, 1138 (2019) (vacating a stay of execution where the inmate waited until one week before his execution date to seek

relief). June 11 is not a magical date, and the injury to the State caused by a delay would not be irreparable because the district court's injunction allows it to execute Mr. Lee by any other authorized method (including lethal injection or the electric chair). The State could have attempted to show why having to execute Mr. Lee by another authorized method, lethal injection for example, would constitute irreparable harm. But it has made no effort to do so. *See* D.E. 146 at 238 (then-Commissioner Hamm testified that the State "still [has] electrocution, lethal injection, nitrogen hypoxia, so all those methods are still available").

Beyond the timing, the Commissioner argues that we should hold the fact that Mr. Lee elected for execution by nitrogen hypoxia over lethal injection against him because of his litigious challenges to both methods. Although we factor this point into the balance of the equities, we cannot say that Mr. Lee knew the extent to which he would suffer conscious severe air hunger for approximately one to three minutes as laid out by physicians eight years after he made this election. In 2018, when Mr. Lee had to elect nitrogen hypoxia as the method of execution, the State had not yet come up with a protocol. And it would not be until 2023 when that protocol was completed.

The public and the State undoubtedly have an expectation that capital punishment will be effectuated. "To unsettle these expectations is to inflict a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the State and the victims of crime alike." *Calderon v. Thompson*, 523 U.S.

538, 556 (1998) (quoting *Herrera v. Collins*, 506 U.S. 390, 421 (1993)). But the public, the State, and Mr. Lee all have an interest in ensuring that executions are carried out consistently with the Constitution. And we note that the effect of the Commissioner's requested stay, if granted, would be to moot this appeal and prevent this Court from reaching the constitutionality of execution by nitrogen hypoxia.

Ultimately, it is Mr. Lee who would be executed under a likely-unconstitutional method—one that we held met the first *Glossip* prong and that the district court held unconstitutional under the Eighth Amendment—if we granted the stay. *See e.g.*, *Enmund v. Florida*, 458 U.S. 782, 798 (1982) (stating that the unconstitutional imposition of a death sentence "is nothing more than the purposeless and needless imposition of pain and suffering"); *Glossip*, 576 U.S. at 877 (indicating that "needless suffering" can create "an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment") (internal quotation marks omitted).

The equities, we believe, favor Mr. Lee. And even if they do not favor Mr. Lee, they do not favor the Commissioner.

## IV

The Commissioner's motion to stay the district court's permanent injunction is **DENIED.**

Luck, Circuit Judge, dissenting:

Twenty-six years ago, Jeffery Lee was sentenced to die for robbing and murdering Jimmy Ellis and Elaine Thompson. Unlike his victims, Lee was allowed to choose his method of execution. Eight years ago, he did that by electing nitrogen hypoxia. His execution is fixed for tomorrow.

Or it was. Two days before Lee's sentence was finally set to be carried out, the district court declared that the state's nitrogen hypoxia protocol facially violated the Eighth Amendment and enjoined the state from executing Lee using the protocol. The state appeals the injunction and moves for a stay pending appeal. I would grant the motion. Because the majority opinion doesn't, I respectfully dissent.

"A court considering whether to issue a stay 'considers four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). Here, the state has met its burden as to each factor.

## I.

"A death row inmate may attempt to show that a [s]tate's planned method of execution, either on its face or as applied to him, violates the Eighth Amendment's prohibition on 'cruel and

unusual' punishment." *Nance v. Ward*, 597 U.S. 159, 164 (2022). "To succeed on that claim . . . he must satisfy two requirements." *Id.* "First, he must establish that the [s]tate's method of execution presents a 'substantial risk of serious harm'—severe pain over and above death itself." *Id.* (quoting *Glossip v. Gross*, 576 U.S. 863, 877 (2015)). Second, "he 'must identify an alternative [method] that is feasible, readily implemented, and in fact significantly reduce[s]' the risk of harm involved." *Id.* (alterations in original) (quoting *Glossip*, 576 U.S. at 877).

In an earlier appeal, we concluded that Lee met his burden as to the first requirement. And on remand, the district court concluded that he met his burden as to the second requirement. Here, the state has made a strong showing that the district court likely erred in finding: that a firing squad was a readily implemented alternative method of execution; that it would significantly reduce the risk of harm involved; and that the state lacked legitimate reasons for not adopting a firing squad as an alternative method.

**A.**

To be "readily implemented," the alternative method of execution must be one the state could carry out "relatively easily and reasonably quickly." *Bucklew v. Precythe*, 587 U.S. 119, 141 (2019) (first quoting *Glossip*, 576 U.S. at 877; and then quoting *McGehee v. Hutchinson*, 854 F.3d 488, 493 (8th Cir. 2017), and *Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1300 (11th Cir. 2016)). Even if the state completely adopted Utah's protocol, it could not relatively easily and reasonably quickly carry out a firing squad execution.

First, Lee presented no evidence that the state has a facility for a firing squad execution. As the state explains, under the Utah protocol, it would need a restraint chair, stacked sandbags sufficient to absorb .30-caliber rifle fire, a large enough firing line between the riflemen and the prisoner, a viewing area, and structural reinforcement to prevent ricochets and ensure the safety of the surrounding area. The state would have to build this structure from scratch because its current facility—Holman Correctional Facility—doesn't have these necessary elements. And the state would then have to test the new elements before they could become operational. For reference, when the state adopted nitrogen hypoxia as a method of execution, that method took five years to implement. At best, the evidence shows that a firing squad execution would eventually be done. But there's no evidence that it would be relatively easy or reasonably quick to do so.

The same is true for finding five marksmen to serve as executioners. Lee presented no evidence that it would be relatively easy and reasonably quick to find five people who are willing to pull the trigger and have the skill to shoot accurately. The marksmen must hit a target the size of a heart from at least twenty feet. Again, at best, the evidence shows that the state would train five people to do the job, but not that it could do so relatively easily and reasonably quickly.

These concerns are not the kind of "incidental delay" that comes with "enact[ing] legislation approving what a court has found to be a fairly easy-to-employ method of execution." *See*

*Nance*, 597 U.S. at 170. In *Nance*, the prisoner alleged that "Georgia ha[d] enough qualified personnel." *Id.* at 166. Here, on the other hand, there's no evidence that the state currently has enough qualified personnel to relatively easily and reasonably quickly carry out the execution. And there was no allegation in *Nance* that Georgia did not have the structural facilities to carry out the execution. Here, the evidence shows that the state does not presently have a facility fit for a firing squad. Instead, we are left with some of the same open questions the Supreme Court found dispositive in *Bucklew*, like how the state should build the new facility to ensure the safety of staff, witnesses, and other prisoners. *See Bucklew*, 587 U.S. at 141. Lee's alternative method of execution doesn't say how that should be done. Because he has not met his burden to provide the answers, as in *Bucklew*, it is likely the district court erred in concluding that a firing squad execution could be readily implemented.

**B.**

The district court also likely erred in concluding that a firing squad in fact significantly reduces the risk of harm involved in the execution. It reached this conclusion based on its finding that there was no evidence contradicting Dr. Williams's opinion that a prisoner executed by firing squad would experience no pain.

This was wrong. There was evidence contradicting Dr. Williams's opinion, supplied by Dr. Williams himself.

> Dr. James Williams, [Lee's] expert in ballistics, emergency medicine, and firearms, described an execution by firing squad at the evidentiary hearing. The

inmate is first fitted with a target over his heart and a hood is placed over his head.  Five riflemen then take aim and fire at the inmate's heart.  When the bullets hit the inmate, they tear the heart muscle to pieces and blow apart the tissue, which causes a rapid and total disruption of blood flow to the brain, and when that blood supply is stopped, loss of consciousness follows.  Before falling unconscious, the inmate feels the physical pain of the bullets' impact.

[ . . . ]

[Dr. Williams'] report [also] supports the inference that the inmate *would* experience physical pain during the three to five seconds before he became unconscious.

*Boyd v. Comm'r, Ala. Dep't of Corr.*, No. 25-13545, 2025 WL 2970017, at *4 (11th Cir. Oct. 20, 2025) (citation modified).  Based on Dr. Williams's description, we explained that "the firing squad subjects the inmate to intense, albeit brief, physical pain.  The firing squad would very likely carry both intense physical pain as well as the psychological and emotional harm to the inmate . . . ." *Id.*

This is not a controversial conclusion.  The Fifth Circuit—reviewing a similar method of execution challenge to Louisiana's nitrogen hypoxia protocol—noted the undisputed evidence "that death by firing squad can cause pain." *Hoffman v. Westcott*, 131 F.4th 332, 336 (5th Cir. 2025).  The South Carolina Supreme Court—reviewing a cruel and unusual punishment claim under the

state constitution—cited evidence from the prisoner's expert that the outer limit of the period of time in which an inmate will suffer pain, absent a botched execution, is "hardly more than fifteen seconds." *Owens v. Stirling*, 904 S.E.2d 580, 600 (S.C. 2024). In *Bucklew*, the Supreme Court lumped in a firing squad with hanging and electrocution as arguably less humane methods of execution compared to lethal injection. *See* 587 U.S. at 135. And even the district court acknowledged that its finding was "not intuitive." Indeed, it wasn't. It was contradicted by the testimony of the same expert the district court relied on. We ourselves previously credited the testimony of Lee's "own expert, Dr. Williams" that, when a prisoner is executed by firing squad, "four bullets strike the [prisoner's] heart, . . . tear[ing] the heart muscles to pieces and blow[ing] apart the tissue," causing the prisoner "pain and suffering." *Boyd*, 2025 WL 2970017, at *4 (citation omitted).

Because there's evidence that a prisoner executed by a firing squad will feel pain and suffering, the district court erred in concluding Dr. Williams's no-pain opinion was uncontradicted. And that error tainted the district court's conclusion that a firing squad would significantly reduce the risk of harm to Lee.

## C.

There's another likely error in the district court's conclusion that the state had no legitimate reasons for declining to switch to a firing squad. The state had a very good reason—the error rate of firing squad executions.

The district court rejected this legitimate reason because, it found, the reason was based on an isolated mishap alone, pointing to the firing squad execution of Mahdi in South Carolina. But the Mahdi execution was not an isolated mishap. Dr. Williams testified that, since 1860, there have been forty-three firing squad executions in Utah and six in South Carolina; of those forty-nine, he said four had been "botched." In other words, a little over eight percent of those firing squad executions went wrong.

Lee presented no evidence of how that figure compared to the frequency of mishaps with the nitrogen hypoxia protocol. But the state did, and the evidence showed that there had been no mishaps since Alabama and Louisiana began using their protocols. Given this evidence, the district court erred in rejecting the state's error-rate reason for not adopting firing squads as the method of execution in Alabama.

## II.

Putting these three likely errors together, the state is likely to succeed in its appeal. Combined with the equitable factors, we should stay the district court's injunction.

First, Lee chose to be executed by nitrogen hypoxia, so he "waived any objection he might have to it." *Stewart v. LaGrand*, 526 U.S. 115, 119 (1999). In *Stewart*, the prisoner was afforded a choice between lethal injection and lethal gas, and he "decided to be executed by lethal gas." *Id.* The Supreme Court vacated the lower court's injunction partly because, "[b]y declaring his method of execution, picking lethal gas over the [s]tate's default form of

execution—lethal injection—[the prisoner] . . . waived any objection he might have to it." *Id.*

We have a similar situation here. Lee had two constitutionally approved default methods of execution—electrocution and lethal injection. He selected nitrogen hypoxia, instead. As in *Stewart*, when making the equitable call on a lower court's injunction, Lee should be held to that choice.

Second, despite the fact that Alabama has two other methods of execution that are constitutionally sound, Lee chose as an alternative method an execution protocol that Alabama does not offer. If Lee was concerned about the nitrogen hypoxia protocol and genuinely wanted a constitutionally assured method of execution, he would have chosen one of the two authorized in Alabama. But he didn't. He sought an alternative that only two states have used over the last one hundred years and sought an injunction that barred any method other than one Alabama doesn't authorize. Even the district court found this was inequitable. So should we. *See Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*, 503 U.S. 653, 654 (1992) ("Equity must take into consideration the [s]tate's strong interest in proceeding with its judgment and Harris' obvious attempt at manipulation.").

Third, Lee delayed bringing his Eighth Amendment claim. He selected nitrogen hypoxia as his method of execution in 2018. Alabama established its protocol in 2023. And it executed five prisoners in 2024 and 2025 before Lee attacked the method of execution. We're in this last-minute scramble because Lee delayed

months and years before bringing his claim on the eve of the statute-of-limitations deadline. We have regularly denied equitable relief where the prisoner waited months or years to bring his claim. *See, e.g., Grayson v. Allen*, 491 F.3d 1318, 1326 (11th Cir. 2007); *Williams v. Allen*, 496 F.3d 1210, 1215 (11th Cir. 2007). We should do so here too.

Fourth, "[b]oth the [s]tate and the victim's family have a strong interest in the timely enforcement of [Lee's] death sentence." *See Williams*, 496 F.3d at 1214. "[E]quity must be sensitive to the [s]tate's strong interest in enforcing its criminal judgment[s] without undue interference from the federal courts." *Bowles v. Desantis*, 934 F.3d 1230, 1247 (11th Cir. 2019) (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)). And, specifically, we have "rejected the argument that" a prisoner "will suffer irreparable harm if he is executed, whereas the state will only suffer a minimal inconvenience, because the state, the victim, and the victim's family also have an important interest in the timely enforcement of [the prisoner's] sentence." *Id.* at 1247–48 (citation modified).

⋆     ⋆     ⋆

For as long as we've had an Eighth Amendment, the Supreme Court has never held that a state's method of execution qualifies as cruel and unusual under the Eighth Amendment. *See Bucklew*, 587 U.S. at 113. Because we shouldn't do so here, I would grant the state's motion to stay the injunction.